[No. B192564. Second Dist., Div. One. Dec. 31, 2007.]

THE PEOPLE, Plaintiff and Respondent, v.
CURTIS L. GRAY, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of parts II. and III.

636

## COUNSEL

Valerie G. Wass, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Michael R. Johnsen and Juliet H. Swoboda, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**ROTHSCHILD, J.**—After the first jury could not reach a verdict, on retrial, the second jury convicted defendant, Curtis L. Gray, of first degree residential burglary. The trial court sentenced him to a term of 25 years to life pursuant to the "Three Strikes" law. The principal issue in his appeal is whether the trial court committed prejudicial error in modifying Judicial Council of California Criminal Jury Instructions (2006–2007) CALCRIM No. 316 (impeaching a witness with a prior felony conviction) to allow the jury to determine if the witness's felony conviction was one "involving moral turpitude" which the court defined as "involving dishonesty." We hold that the modified instruction was erroneous but that the error was not prejudicial under the facts of this case. Finding no other errors, we affirm the judgment.

### FACTS AND PROCEEDINGS BELOW

The victim, Dana Scott, lived across the street from her parents, Patricia and Percy Kirklin.[1] When Scott moved into her home, she gave her parents a key to the metal security door that covered the wooden front door of the house. Scott did not have a key to the wooden door, so she always left it unlocked.

---

[1] Because they have the same last name we will refer to the Kirklins by their first names.

Late one afternoon Scott called her mother and asked her to go to her house, let the dog out and turn on some lights. Patricia unlocked the metal security door but she could not enter because the wooden door was locked. She returned home and asked Percy to try to open the front door. Percy took the screen off a front window, reached under the window which was slightly ajar, and unlocked the wooden door. Before he removed the screen, he noticed that it was slightly bent.

Patricia and Percy entered Scott's house. The locked door and the bent screen aroused Percy's suspicion so he decided to check the rooms. In the back bedroom, he saw a pair of pant legs and two feet in the closet with the soles of the shoes facing up as though the person was lying face down. Percy immediately left the bedroom and told his wife to call the police. At that point Gray called out: "Mr. Kirklin, you know me. I'm Curtis." Gray told Percy there was no need to call the police; that he had come by to visit Scott and was planning to surprise her. Gray then walked past Percy and out the front door. Percy noticed Gray had a backpack over his shoulder.

After Gray left, Patricia and Percy returned home, called Scott and told her what had just happened. Scott asked her parents to call the police, which they did.

Scott filed a police report stating that several items that she had seen in her jewelry box that morning now were missing. Patricia told the police that she recognized the man who had been in Scott's house as Curtis Gray. She recognized Gray because approximately a year earlier he and others had helped Scott move to her house.

Scott testified that Gray was an acquaintance she had met through her ex-husband. She acknowledged that Gray had helped her move into her house but stated that after the move she saw him infrequently. Her last contact with Gray was by telephone two weeks before he was found inside her house. At that time she told him to stop calling her and to leave her and her family alone. Scott testified that she did not talk to Gray after that call and that she did not give him permission to enter her house or take anything from her house.

Before Gray testified, the parties and the trial court discussed what evidence regarding his prior convictions for robbery, grand theft, receiving stolen property and arson would be admitted as impeachment. Like the court in his previous trial, this court ruled that it would permit Gray to be impeached by evidence that he had been convicted of four prior but unspecified felony convictions involving "moral turpitude" and one conviction for arson. The court also informed the parties that, unlike the previous trial, it

would define "moral turpitude" in the jury instruction on credibility. Defense counsel did not object to the court's evidentiary ruling but reserved the right to argue on the jury instruction. Based on the trial court's ruling, Gray's testimony began with his acknowledgement that he had been convicted of two felonies involving moral turpitude in 1987, another felony involving moral turpitude in 1994 and a fourth felony involving moral turpitude in 2001. Gray also admitted a 2001 felony conviction for arson.

Gray testified that he did not know Scott's ex-husband, did not become acquainted with her through her ex-husband, but met Scott through a computer dating service. He had spent time with her on four or five occasions and also met her parents. A week before the alleged burglary Scott called him and asked him to help her move again. She arranged to leave a set of keys to the house in her mailbox so that he could help pack while she was at work. According to their arrangement, he found the keys and entered the house. He spent the morning packing, then he had lunch, took a nap, and resumed packing. He was packing items in the closet in the back bedroom when he heard Scott's father, Percy, yell, "Who's in the house?" Gray came out of the closet and identified himself. Percy asked him what he was doing there, and Gray told him he was there to help Scott pack. Percy stated he did not know anything about that and asked Gray to leave, which he did. Gray denied taking anything from Scott's house.

After the close of evidence, the parties and the court conferred regarding the credibility instruction pertaining to felony convictions. Defense counsel argued that the court should give the instruction in CALCRIM No. 316, which allows consideration of a witness's "felony" conviction only for the purpose of evaluating the witness's credibility,[2] and objected to any reference in the instruction to convictions involving "moral turpitude" or including a definition of "moral turpitude" in the instruction. The prosecutor argued that the court should instruct the jury that four of the felonies Gray committed involved dishonesty. The court instructed the jury that in determining the credibility of a witness it could consider the fact that the witness had been convicted of a felony "involving moral turpitude" and that "moral turpitude is defined as involving dishonesty."

The jury convicted Gray of the first degree burglary of a residence, and the trial court sentenced him to a term of 25 years to life under the Three Strikes law (Pen. Code, § 667, subds. (b)–(i)). Gray filed a timely notice of appeal.

---

[2] We discuss CALCRIM No. 316 in more detail in part I. of this opinion.

## DISCUSSION

### I. *THE INSTRUCTION REGARDING GRAY'S PRIOR FELONY CONVICTIONS.*

Gray contends the trial court erred in the instruction on the consideration of prior felony convictions in determining credibility. We agree the court erred but we conclude that the error was harmless.

The trial court instructed the jury with its own modified version of CALCRIM No. 316 as follows (the court's modifications are in italics): "If you find that a witness has been convicted of a felony *involving moral turpitude*, you may consider that fact only in evaluating the credibility of the witness's testimony. *Moral turpitude is defined as involving dishonesty.* The fact of a conviction does not necessarily destroy or impair a witness's credibility. It is up to you to decide the weight of that fact and whether that fact makes the witness less believable." The court erred in making these modifications for three reasons.

■ Although a witness may be impeached by evidence of conviction of a crime involving moral turpitude (*People v. Castro* (1985) 38 Cal.3d 301, 313–314 [211 Cal.Rptr. 719, 696 P.2d 111]), whether the conviction proposed as impeachment involves moral turpitude is for the trial court to decide, not the jury. (*Id.* at pp. 313–314, 316.) Thus, contrary to the language of the modified instruction, it is not within the jury's province to "find that a witness has been convicted of a felony involving moral turpitude."

■ The modified instruction is also incorrect in limiting moral turpitude to dishonesty. Our Supreme Court has defined moral turpitude more broadly as a " 'general readiness to do evil' " which may, but does not necessarily, involve dishonesty. (*People v. Castro, supra,* 38 Cal.3d at p. 315.) A conviction for arson, for example, shows "a readiness to do evil" but does not involve dishonesty. (*People v. Miles* (1985) 172 Cal.App.3d 474, 481–482 [218 Cal.Rptr. 378].) (The trial court acknowledged this difference but stated it was immaterial in this case because all of Gray's unspecified felonies involved dishonesty.)

Finally, the court erred in modifying CALCRIM No. 316 because the modification conflicted with the unmodified instruction the court gave pursuant to CALCRIM No. 226 which instructs the jury that in evaluating a witness's testimony, it may consider anything that reasonably tends to prove or disprove the truth or accuracy of that testimony including that the witness has "been convicted of a felony."

■ Although the trial court erred in modifying CALCRIM No. 316, the errors were not prejudicial.

Gray acknowledges, and we agree, that his convictions for robbery, grand theft and receiving stolen property involved moral turpitude. Therefore, evidence of those convictions was relevant to the issue of Gray's credibility, and the trial court properly admitted that evidence. (*People v. Castro, supra,* 38 Cal.3d at p. 315.) The court also properly instructed the jury under CALCRIM No. 316 that it must determine whether he was convicted of a felony. Allowing the jury also to decide whether Gray's felonies involved moral turpitude did him no harm because as a matter of law those felonies did involve moral turpitude. Indeed, the court had correctly made that determination when it admitted the evidence of the felonies.

■ Gray contends that the modified instruction which told the jury that moral turpitude involves dishonesty requires reversal of his conviction because it "served to direct the jury to disregard appellant's defense and adopt the prosecution's view of the evidence." He argues that the court, in effect, told the jurors that if the felony was one of moral turpitude they must find him dishonest and reject his defense. In support of this contention defendant points to the omission of "moral turpitude" to modify "conviction" in the penultimate sentence of the instruction cautioning the jury, "The fact of a conviction does not necessarily destroy or impair a witness's credibility." The failure to repeat the modifier "involving moral turpitude" in the sentence cited by defendant does not change the meaning of the instruction read as a whole. More importantly, the instruction does not require the jury to find defendant dishonest. Rather, it allows the jury to consider a conviction of a crime of moral turpitude in evaluating credibility.

■ We acknowledge that whenever a jury is informed of a defendant's convictions, even for the limited purpose of impeaching his credibility, a danger exists that some jurors also will view that evidence as showing a defendant's propensity to commit crimes despite having been instructed not to do so. (*People v. Rollo* (1977) 20 Cal.3d 109, 116 [141 Cal.Rptr. 177, 569 P.2d 771].) The Evidence Code, however, entitles the People to present evidence of the credibility of any witness, including a criminal defendant (Evid. Code, § 785) and "[n]o witness including a defendant who elects to testify in his own behalf is entitled to a false aura of veracity." (*People v. Beagle* (1972) 6 Cal.3d 441, 453 [99 Cal.Rptr. 313, 492 P.2d 1].)

■ To the extent evidence of a criminal conviction is so prejudicial that it outweighs its evidentiary value, the trial court may exclude it. (Evid. Code, § 352.) Defendant, however, does not contend that the evidence of his convictions should have been excluded. Indeed, although the trial court could

have permitted evidence of defendant's actual prior convictions (Evid. Code, § 788; *People v. Terry* (1962) 57 Cal.2d 538, 563 [21 Cal.Rptr. 185, 370 P.2d 985]; cf. *People v. Muldrow* (1988) 202 Cal.App.3d 636, 646–647 [248 Cal.Rptr. 891] [affirming admission of defendant's three prior burglary convictions in the trial on a new charge of burglary]) by "sanitizing" his convictions it reduced the potential prejudice of those convictions. The court thus focused the jury's attention on how those crimes might affect Gray's credibility rather than on how similar those crimes were to the crime for which he was on trial. Because the modified instruction limited the jury's consideration to felonies involving dishonesty, it caused the jury to consider the element of those crimes that gives them their greatest probative value for impeachment. As the court recognized in *Castro*, "Obviously it is easier to infer that a witness is lying if the felony of which he has been convicted involves dishonesty as a necessary element than when it merely indicates a 'bad character' and 'general readiness to do evil.' " (*People v. Castro, supra,* 38 Cal.3d at p. 315.)

In this case, the danger that the jurors might misuse the felony impeachment evidence to conclude that Gray is a bad character or prone to acts of dishonesty is reduced because not only the judge but the prosecutor instructed them not to do so. In her closing argument, the prosecutor told the jury: "I don't want you to . . . convict the defendant because he's got these convictions in the past. That's not the purpose for which you get to learn that he has those convictions, and I'm instructing you specifically don't find him guilty just because he's got those convictions in the past . . . ."

Finally, Gray argues that he has shown prejudice from the erroneous instruction because the jury hung in the first trial and convicted him in this trial although the only significant difference between the two trials is that in the first trial the court did not instruct that crimes of moral turpitude involve dishonesty but in the second trial it did. We disagree. The evidence was not identical and, in any case, it is impossible to know what facts and arguments one jury found significant and another jury did not.

II., III.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

*See footnote, *ante*, page 635.

## DISPOSITION

The judgment is affirmed.

Vogel, Acting P. J., and Jackson, J.,* concurred.

Appellant's petition for review by the Supreme Court was denied April 9, 2008, S160638.

---

*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.