Filed 6/8/22  P. v. Thomas CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JOSHUA THOMAS,<br><br>    Defendant and Appellant. | C093970<br><br>(Super. Ct. No. 19FE021265) |

On November 22, 2019, the victim was at home watching a movie with her son and her daughter when she heard two gunshots and the crash of glass shattering. She then saw defendant Joshua Thomas, her former boyfriend and father of the two children, entering the house through the shattered glass of the sliding glass door. The victim had a restraining order against defendant at the time. Defendant said, "This is it, or, This ends today." He backed the victim into a corner, pointing a gun at her head. The son begged defendant not to shoot the victim. When defendant walked down a hallway, the victim

1

and the son fled, joining the daughter who had already run outside. Responding police found what turned out to be a BB gun at the scene.

A jury found defendant guilty of first degree residential burglary, stalking with a restraining order in effect, assault with a deadly weapon, making criminal threats, misdemeanor violation of a protective order, and two counts of misdemeanor child abuse. The trial court sentenced defendant to an aggregate term of 20 years 4 months.

On appeal, defendant asserts (1) the trial court abused its discretion in admitting evidence of two prior convictions for impeachment purposes, (2) he was denied the constitutionally effective assistance of counsel because his attorney did not request a limiting instruction as to the prior convictions evidence, (3) those two errors were cumulatively prejudicial and rendered his trial unfair, (4) the trial court erred in failing to stay execution of sentence on the conviction of making criminal threats pursuant to Penal Code section 654[1] because that was the target felony of the burglary, and (5) the imposition of fines and fees without a determination he had the ability to pay violated his constitutional rights. The Attorney General asserts (6) the trial court erred in failing to impose sentences on the three misdemeanor counts. After briefing was completed, we granted defendant's request to file supplemental briefing, in which defendant asserts (7) remand for resentencing is required following enactment of Senate Bill No. 567 (2021-2022 Reg. Sess.) (Stats. 2021, ch. 731).

We conclude defendant's claims of trial error are without merit. We will vacate sentence and remand for full resentencing.

### FACTUAL AND PROCEDURAL HISTORY

An amended information charged defendant with first degree residential burglary (§ 459; count one); stalking with a restraining order in effect (§ 646.9, subd. (b); count

---

[1] Further undesignated statutory references are to the Penal Code.

two); assault with a deadly weapon (§ 245, subd. (a)(1); count three); making criminal threats (§ 422; count four); misdemeanor violation of a protective order (§ 273.6, subd. (a); count five); and two counts of misdemeanor child abuse (§ 273a, subd. (b); counts six & seven). The amended information further alleged defendant had sustained a prior serious felony conviction subjecting him to Three Strikes sentencing (see §§ 667, subds. (b)-(i), 1170.12), and that, pursuant to section 667, subdivision (a), he was subject to a five-year enhancement for his prior serious felony conviction.

### *The Prosecution's Case*

The victim and defendant began dating in 2009. They were the parents of a daughter (the daughter) and a son (the son).

The victim testified she had reported abuse by defendant in 2010. On that occasion, defendant and two of their friends were at the victim's house. Defendant wanted to take the victim's car to get something to eat, but the victim said no because they were all "really drunk." Defendant and the victim were in the hallway, defendant yanked the victim's hair back, and the victim fell to the floor. Later, the victim was in her room and defendant threw her on the bed with his hands around her neck. The victim reported the incident to the police.

The victim and defendant broke up in 2014. Defendant moved out and the children stayed with the victim. Initially, defendant did not see the children. However, eventually, he began to have the children stay with him on weekends. This arrangement continued until April 2018. The victim, encouraged by taking some classes and participating in counseling, decided she had to set some boundaries and tell defendant he could no longer talk to her in certain ways, call her names, and, essentially, emotionally abuse her. She also raised the possibility of obtaining a court-ordered custody and visitation agreement. The victim believed that having such an agreement "would be best for everybody." However, defendant made it very clear he did not want to go to court or "to have an order for his children . . . ." Defendant blamed the victim for breaking up the

family.  He told her she "was responsible for these broken little hearts, and [she] was going to feel all the pain that he felt, and he was going to break [her] and destroy [her] . . . ."  At that point, the victim "just couldn't do it anymore."

On May 27, 2018, at approximately 1:00 a.m., defendant came to the victim's door and banged on the door and rang the doorbell.  The victim called the police, but, by the time they arrived, defendant was gone.  On June 1, 2018, the victim called the police again because defendant was making threats.

On June 27, 2018, the victim was at home with the children and her father when defendant banged on the door.  Defendant broke through the gate and went into the backyard.  He grabbed a metal chair, held it over his head, and lunged toward the glass door several times like he was going to crash through the glass.  He was demanding to be let in.  When the victim's father thought defendant had left, he went outside.  He was surprised to find defendant was still there.  The victim's father told defendant to leave, and defendant threatened to burn the house down and bomb it.  The victim's father went to the front of the house and yelled for help.  Neighbors called the police.

Defendant left the victim dozens of voicemails on her phone.  He told her he "is not going to listen to the police, he is not going to listen to a court order or a restraining order, that if he doesn't see his kids, then no one will or no one can."  He also mentioned he had a .22-caliber gun.

By July 10, 2018, the victim had gone to court seeking a restraining order.  On that date, the victim saw a Facebook post in which defendant was holding a gun, which caused her to be afraid.

Very early in the morning prior to the hearing on the restraining order on July 24, 2018, the victim called the police because defendant made a threat regarding a gun.  Defendant had sent text messages until 2:00 a.m. to the victim's father, who was staying with her.  In the last message, defendant indicated he was in a field behind the victim's house with an AR-15.  According to the victim's father, defendant's text stated he had a

4

gun and that if anyone stuck their head out the door, he would shoot. The restraining order issued later on July 24, 2018. The order protected the children as well as the victim.

Defendant continued to post messages on Facebook that the victim found to be threatening. One post, referring to her, said, "I am going to shoot this woman. She will not live to see another day. Remember me."

Defendant lived with his mother approximately 15 to 20 minutes away by car from the victim's neighborhood. The victim testified defendant came to her house many times between when the restraining order issued and November 22, 2019. On September 16, 2018, the victim was at a park with the children and a neighbor called her and told her defendant was at her house. Driving from the park, the victim saw defendant a few streets over from her own. On another occasion, after dropping the children off at school, the victim saw defendant in her neighborhood on a bicycle. In February 2019, a neighbor sent the victim a Ring video and said, "I think that he is outside your house." The victim saw defendant on the video.

On August 12, 2019, at 4:00 a.m., the victim saw a Ring notification on her phone and, when she accessed the video, she saw defendant riding a bicycle by her driveway. He set the bicycle down and the victim called 911. Defendant came to the door and rang the doorbell. The prosecutor played the 911 call for the jury. On the call, among other things, the victim stated, "He just threatened me." On cross-examination, the victim testified that, when she said defendant had "just" threatened her, she "was referring to probably in the past recently. Not in that moment. Just past threats, just threatened me, like feeling threats to my life, like recently, not in that moment." The victim estimated that, between the issuance of the restraining order and November 22, 2019, she saw defendant near her house approximately 20 times.

November 22, 2019, was a Friday and the children were off from school. In the afternoon, the victim and the children were sitting on the couch together watching a

movie. The victim heard two gunshots which she described as two loud "pops." According to the son, who was eight years old at the time of trial, defendant "came and was shooting" the door. The son heard one shot and glass broke. The victim and the children all jumped up and the victim heard glass shattering and falling. The daughter immediately ran out of the house. The victim saw defendant by the back sliding glass door and saw him pushing the glass. More glass shattered and fell to the ground. Defendant put his head through an opening in the glass and looked around. Defendant said, "This is it, or, This ends today."

Defendant entered the house through the broken glass door. He was holding a gun. Defendant raised the gun to waist level and went around the couch. The victim backed up and pleaded with defendant to put the gun down. The son was behind her. Defendant "kept coming at" the victim with the gun raised. As defendant approached the victim, she backed into a corner. The son hid behind a chair that was behind the victim. According to the son, defendant was in front of the victim, and he held a gun, "kind of threatening her." According to the victim, defendant stood above her holding the gun no more than a foot away from her, pointed at her head, as she crouched in the corner. The victim screamed, closed her eyes, and thought she was going to die. The son shouted, "Don't shoot her." The victim opened her eyes and discovered defendant had walked down a hallway. She grabbed the son and went out the front door. Outside, they found the daughter and went to a neighbor's house where someone called 911. The 911 call was played for the jury. The victim told the 911 operator that defendant shot her glass door, came into her home, had her in a corner with the son, and pointed a gun at her. The prosecution also played a Ring camera video from November 22, 2019. The victim could be heard in the background screaming for defendant to stop and the son could be heard begging. Responding officers located a BB gun in the master bedroom closet on a pile of clothing. On cross-examination, the son testified he may have only heard the word

6

"threatening" on one prior occasion, when the victim used that word in talking about defendant.

## The Defense's Case

Defendant testified that, for some time, when he was living with his mother, the victim would bring the children to him for weekend visitation. However, at some point, she began to prevent him from seeing the children. Defendant believed she did so after he had a conversation with the children encouraging them to talk to him, which he did because he believed they were becoming more withdrawn and he believed their behavior had been changing. Also, when the victim would pick the children up, they would tell him they did not want to go with her, and that they wanted to stay with defendant. The son told defendant the victim had "smacked him with the remote, and his head was hurting all day." The daughter told him that, when the victim got mad at her, she would hold her down on the bed and yell at her. Defendant also testified the children would "act like boyfriend and girlfriend." The daughter told defendant of certain inappropriate conduct she had engaged in at school, including that "she poked a kid in the butt with a stick."

Defendant denied sending text messages threatening the victim or her father the morning before the hearing on the restraining order. He did not send a threat about an AR-15. With regard to a photograph he posted on Facebook which showed him with a gun, defendant testified it was a BB gun, not a real gun, and that he just posted it because he "thought it was a cool picture." Defendant acknowledged threatening the victim twice, posting on Facebook, "I was going to shoot this woman. She won't live to see another day." However, he testified "it was a cry for help." Defendant testified he would ride his bicycle from downtown Sacramento to the victim's neighborhood because he was determined to see the children, "[a]nd if I got to do time, I was going to do that."

7

Defendant testified that, one weekend, he went to confront the victim because she did not bring the kids to him on Friday. When he arrived at her house, she immediately called 911. Defendant admitted that he violated the restraining order.

Defendant acknowledged going to the victim's house on November 22, 2019. He had a BB gun with him because, he testified, the victim "said once I was the only man in her life she ever wanted to kill." He testified that she had attacked him with a hammer on a previous occasion, and that she had a stun gun. At the victim's house, defendant hopped over a fence into the backyard. He approached the sliding glass door, but he could not see inside. He tried to open the door, but it was locked. He struck the glass three times with the butt of the BB gun and the glass shattered. Defendant testified his only intent was to talk to his kids. He did not intend to hurt or scare anyone. He also testified he did not shoot the BB gun. Defendant took a few steps into the house and saw the victim. Defendant denied pointing the BB gun at anyone. Not realizing the daughter had left, defendant went towards the kids' room to talk to her, but she was not there. Defendant realized "[t]his was a bad idea." Defendant tossed the BB gun in a closet before police arrested him.

### *Verdict and Sentencing*

The jury found defendant guilty on all counts. At a subsequent court trial, the court found true the allegation that defendant had been convicted of a prior serious felony. The trial court sentenced defendant to an aggregate term of 20 years 4 months consisting of 12 years on count one, the upper term of six years doubled for his strike prior; two years on count two, one third the midterm of three years doubled; and 16 months on count four, one third the midterm of two years doubled. The court also imposed a five-year term for the section 667, subdivision (a) prior serious felony enhancement. The court imposed a six-year term on count three, the midterm of three years doubled, and stayed execution of sentence pursuant to section 654. On the three

8

misdemeanors, the trial court stated: "Probation will be denied for those, and no time imposed."

## DISCUSSION

## I

### *Admission of Prior Convictions for Impeachment Purposes*

Defendant asserts the trial court erred and violated his due process rights in admitting evidence of his prior convictions for impeachment purposes. Defendant does not argue his prior convictions were not for crimes of moral turpitude. Rather, he asserts the evidence of his prior convictions was more prejudicial than probative under Evidence Code section 352. Defendant asserts his prior convictions should not have been admitted due to remoteness and his minimal criminal history in the interim.

### A. Additional Background

In in limine motions, the prosecution sought to admit defendant's prior convictions in the event defendant testified. In argument on the in limine motions, the court noted defendant had prior convictions for transportation of a controlled substance (Health & Saf. Code, § 11352, subd. (a)) in 1999, and voluntary manslaughter (§ 192, subd. (a)) in 2001. The court stated these were crimes of moral turpitude, "showing a readiness to do evil." According to the prosecutor, defendant was paroled in July 2005. He was returned to custody in 2008, presumably related to a 2008 conviction of misdemeanor driving under the influence. (Veh. Code, § 23152, subd. (b).) He was discharged from parole in January 2009. Relevant to remoteness, the prosecutor stated defendant's misconduct against the victim extended back many years, noting she had reported domestic violence as early as 2010. In 2016, she reported defendant was unlawfully using her financial information. In 2018, the stalking escalated. The prosecutor argued there had not been a break in defendant's criminal conduct for any significant period of time since his parole. The prosecutor asserted both convictions should come in.

Defense counsel argued the two felonies were remote, approximately 20 years old. Defense counsel further argued that only one prior conviction should be admitted, and that the voluntary manslaughter conviction was prejudicial. However, he did acknowledge defendant was not entitled to mislead the jury that he had led a crime-free life. Defense counsel urged that any conviction that was admitted should be sanitized.

The court agreed the voluntary manslaughter conviction was remote, but also noted it was a very serious conviction. The court stated defendant was not entitled to an "aura of veracity." The court also noted the timeline as represented by the prosecutor, including the fact that defendant was discharged from parole in 2009 and, within a year, began engaging in behavior towards the victim that could be construed as harassment or stalking, which continued for several years until a restraining order issued in 2018. The court concluded both convictions reflected on defendant's credibility. The court found both prior convictions relevant, and found that their probative value outweighed their prejudicial effect. The court stated that it would reduce the prejudicial impact by sanitizing the prior convictions, referring to them as felonies involving moral turpitude.

In his trial testimony, defendant acknowledged that, in 1999 or 2000, he sustained two felony convictions.[2] On cross-examination, he agreed he had been convicted of those two felony crimes of moral turpitude.

**B. The Admission of Prior Convictions for Impeachment Purposes**

" 'Any prior felony conviction of any person in any criminal proceeding . . . shall subsequently be used without limitation for purposes of impeachment . . . in any criminal proceeding.' " (*People v. Carkhum-Murphy* (2019) 41 Cal.App.5th 289, 294, quoting Cal. Const., art. I, § 28, subd. (f)(4).) "In exercising its discretion under Evidence Code

---

[2]     Defendant committed his two prior felonies in 1998 and 2000, and was convicted of them in 1999 and 2001, respectively.

10

section 352, the court must consider [(1)] whether the prior conviction reflects adversely on the witness's honesty or veracity, [(2)] its nearness or remoteness in time, [(3)] its similarity to the present offense, and [(4)] the potential effect on the defendant's failure to testify." (*Carkhum-Murphy*, at p. 295; accord, *People v. Mendoza* (2000) 78 Cal.App.4th 918, 925 (*Mendoza*).)

Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." "A trial court's exercise of discretion 'will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' " (*People v. Holford* (2012) 203 Cal.App.4th 155, 168.)

## C. Analysis

Because defendant does not challenge the determination that his prior convictions were ones involving moral turpitude, we turn to the Evidence Code section 352 balancing analysis and the four factors set forth *ante* to be considered as guidance in the context of the admission of prior convictions for impeachment purposes.

Defendant's prior convictions were for crimes involving moral turpitude. (See *People v. Coad* (1986) 181 Cal.App.3d 1094, 1110 [voluntary manslaughter involves moral turpitude under *People v. Castro* (1938) 38 Cal.3d 301]; *People v. Navarez* (1985) 169 Cal.App.3d 936, 949 ["a conviction under section 11352 does satisfy the threshold test of *Castro*, 'a readiness to do evil,' and thus entails moral turpitude"].) Therefore, those convictions were relevant to, and reflected adversely on, defendant's honesty or veracity. (See *People v. Robinson* (2005) 37 Cal.4th 592, 626 [convictions "reflected a crime of moral turpitude *and therefore were relevant to the witnesses' honesty and veracity*" (italics added)]; see also *People v. Wheeler* (1992) 4 Cal.4th 284, 295-296 [misconduct "involving moral turpitude may suggest a willingness to lie"].)

11

With regard to remoteness, defendant's prior convictions were indeed remote. However, as the prosecutor argued, defendant was incarcerated following his prior convictions from 2001 until he was paroled in July 2005. He was returned to custody in 2008, presumably related to his 2008 conviction of misdemeanor driving under the influence. (Veh. Code, § 23152, subd. (b).) He was discharged from parole in January 2009. The next year, in 2010, the victim first reported abuse committed by defendant against her. According to the prosecutor, in 2016, the victim reported defendant was unlawfully using her financial information. As of 2018, defendant's stalking of the victim escalated, leading to the victim obtaining a restraining order in July 2018. "Even a fairly remote prior conviction is admissible if the defendant has not led a legally blameless life since the time of the remote prior." (*Mendoza, supra*, 78 Cal.App.4th at pp. 925-926.) Under the circumstances of this case, the trial court did not abuse its discretion in determining that defendant's prior convictions were not so remote as to warrant preclusion.

Discussing the third factor, the prior conviction's similarity to the charged offense, the Supreme Court has noted, " '[w]here multiple convictions of various kinds can be shown, strong reasons arise for excluding those which are for the same crime because of the inevitable pressure on lay jurors to believe "if he did it before he probably did so this time." ' " (*People v. Beagle* (1972) 6 Cal.3d 441, 453, abrogated on another point in *People v. Diaz* (2015) 60 Cal.4th 1176, 1190.) Defendant's prior convictions posed no such danger here. The prior convictions were not similar to the charged offenses, beyond the fact that the prior conviction of voluntary manslaughter and at least one of the charged offenses involved violence. Moreover, any risk of this sort of prejudice was forestalled by the trial court's sanitization of the prior convictions. Even if they were similar to the charged offenses, which they were not, the jury would not learn of the similarity.

Finally, the trial court's decision to admit the prior convictions for impeachment purposes had no adverse impact on defendant's right to testify "because defendant actually took the stand and suffered impeachment with the priors." (*Mendoza, supra*, 78 Cal.App.4th at p. 926.)

Furthermore, any prejudice resulting from the admission of the prior convictions was mitigated by the trial court's determination that the evidence would be sanitized, limiting the evidence to the fact that defendant had sustained two prior felony convictions involving moral turpitude, with the prosecution forbidden from exploring the matter further. (*People v. Gray* (2007) 158 Cal.App.4th 635, 642 [by sanitizing the defendant's prior convictions the trial court "reduced the potential prejudice of those convictions"].)

We agree with the trial court's determination that the probative value of the evidence of defendant's prior convictions was not substantially outweighed by the probability that its admission would create a substantial danger of undue prejudice. (Evid. Code, § 352.) The trial court neither abused its discretion nor violated defendant's constitutional due process rights by admitting defendant's two prior convictions for impeachment purposes.

## II

### *Ineffective Assistance of Counsel - Failure to Request Limiting Instruction*

#### A. Additional Background and Defendant's Contentions

In connection with the admission of the prior convictions evidence, the trial court instructed the jury with CALCRIM No. 316: "If you find that a witness has been convicted of a felony, you may consider that fact in evaluating the credibility of the witness's testimony. The fact of a conviction does not necessarily destroy or impair a witness's credibility. It is up to you to decide the weight of that fact and whether that fact makes the witness less believable." The Bench Notes for CALCRIM No. 316 state that, if "a felony conviction or other misconduct has been admitted only on the issue of credibility, give the bracketed word 'only.' " (Judicial Council of Cal., Crim. Jury Instns.

13

(2020 ed.) Bench Notes to CALCRIM No. 316, p. 87.)  The bracketed "only" appears in the first sentence of the instruction:  "If you find that a witness has been convicted of a felony, you may consider that fact [only] in evaluating the credibility of the witness's testimony."  (CALCRIM No. 316.)  Defense counsel did not request this modification, and the trial court did not add the word "only" to the instruction.  Nor did counsel request any additional limiting instruction in reference to the evidence of defendant's prior convictions.

" ' "[I]n general, the trial court is under no duty to instruct *sua sponte* on the limited admissibility of evidence of past criminal conduct." ' " (*People v. Hinton* (2006) 37 Cal.4th 839, 875.)  Defendant acknowledges as much, and asserts his trial counsel provided constitutionally ineffective assistance by failing to request a limiting instruction informing the jury that the prior convictions evidence could not be used as propensity or character evidence.

### B.  Ineffective Assistance of Counsel Standard of Review

To prevail on a claim of ineffective assistance of counsel, a defendant must show (1) counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and (2) the deficient performance prejudiced defendant. (*Strickland v. Washington* (1984) 466 U.S. 668, 691-692 (*Strickland*); *People v. Ledesma* (1987) 43 Cal.3d 171, 216-217 (*Ledesma*).)  "On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation.  All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding." (*People v. Mai* (2013) 57 Cal.4th 986, 1009.)

## C. Deficient Performance

We cannot conclude counsel's failure to request the modification of CALCRIM No. 316 with the addition of the word "only," or failure to request an additional limiting instruction, constituted constitutionally deficient performance.

With regard to CALCRIM No. 316, again, the trial court instructed the jury: "If you find that a witness has been convicted of a felony, *you may consider that fact in evaluating the credibility of the witness's testimony*. The fact of a conviction does not necessarily destroy or impair a witness's credibility. It is up to you to decide the weight of that fact and whether that fact makes the witness less believable." (Italics added.) Counsel could have reasonably concluded this instruction sufficiently indicated that defendant's prior convictions were to be considered only in evaluating his credibility and that there was no need for further clarification. As the Attorney General notes, each of the instruction's three sentences connects the prior conviction to credibility. Additionally, immediately prior to instructing the jurors with CALCRIM No. 316, the trial court instructed the jury with CALCRIM No. 303: "During the trial certain evidence was admitted for a limited purpose. You may consider that evidence only for that purpose and for no other." Defense counsel could have reasonably concluded that, particularly in light of these two instructions considered together, it was clear defendant's prior convictions were only to be considered in reference to his credibility and for no other purpose and there was no need to request the addition of the word "only" to the instruction.

As for the possibility of requesting an additional limiting instruction, " '[a] reasonable attorney may have tactically concluded that the risk of a limiting instruction . . . outweighed the questionable benefits such instruction would provide.' " (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1053.) Counsel may have deemed it unwise to call additional attention to defendant's two prior convictions, sanitized though they were, by

15

requesting an additional limiting instruction in reference to those convictions. (See *People v. Hinton, supra*, 37 Cal.4th at p. 878; *Hernandez*, at p. 1053.)

The record does not "affirmatively disclose[ ] counsel had no rational tactical purpose for" declining to request the addition of the word "only" to the trial court's CALCRIM No. 316 instruction or declining to request an additional limiting instruction. (*People v. Mai, supra*, 57 Cal.4th at p. 1009.) Nor can we say on this record that there "simply could be no satisfactory explanation" for counsel's choices. (*Ibid.*) Defendant has not established counsel's performance fell below an objective standard of reasonableness under prevailing professional norms. (*Strickland, supra*, 466 U.S. at pp. 691-692; *Ledesma, supra*, 43 Cal.3d at pp. 216-217.)

### D. Prejudice

Furthermore, defendant has not established prejudice. To show prejudice, defendant must show a reasonable probability that he would have received a more favorable result had counsel's performance not been deficient. (*Strickland, supra*, 466 U.S. at pp. 693-694; *Ledesma, supra*, 43 Cal.3d at pp. 217-218.)

The trial court's instructions to the jury indicated evidence of defendant's two prior convictions were to be considered by the jurors in evaluating the credibility of the witness's testimony. (CALCRIM Nos. 303 & 316.) Evidence of defendant's prior convictions was sanitized. Defendant only acknowledged he had sustained two prior felony convictions of crimes involving moral turpitude. The jury also learned those convictions were remote, as defendant testified he sustained felony convictions in 1999 and 2000.[3] The prosecutor did not mention the prior convictions in closing arguments.

The evidence of defendant's guilt was strong. The victim testified she heard two loud gunshots or "pops," the sliding glass door to the backyard shattered, and defendant,

---

[3]     See footnote 2, *ante*.

16

against whom she had a restraining order, entered her house with a gun in his hand. He did so only after telling her, "This is it, or, This ends today." He then backed her into a corner, pointing the gun at her head as she crouched in the corner, before he walked down a hallway, allowing her to escape with the son. Her testimony was corroborated by the son's. He heard one shot as the glass of the sliding glass door broke. According to the son, defendant held a gun, "kind of threatening" the victim. The son shouted, "Don't shoot her." The victim's testimony was also corroborated by the Ring video, on which the victim could be heard screaming for defendant to stop and the son could be heard begging. The victim's testimony was further corroborated by her 911 call, in which she told the 911 operator that defendant shot the glass door, came into her home, had her in a corner with the son, and pointed the gun at her. Evidence of defendant's prior uncharged act of domestic violence in 2010 also supported the prosecution's case. (See Evid. Code, § 1109.) Also supporting the prosecution's case were threats defendant made against the victim on social media, including a Facebook post stating, "I am going to shoot this woman. She will not live to see another day. Remember me." In his testimony, defendant admitted he broke into the house through the sliding glass door, and admitted he was armed with a BB gun. Otherwise, defendant's testimony that he broke into the victim's house through the backyard sliding glass door, armed with a BB gun, after making threats against the victim and after repeatedly violating the restraining order, merely to talk to his children was unpersuasive, as the jury determined.

On this record, defendant has not established it is reasonably probable he would have achieved a more favorable result had his trial counsel requested the word "only" be added to the trial court's CALCRIM No. 316 instruction or had counsel requested an additional limiting instruction. (See *Strickland, supra*, 466 U.S. at pp. 693-694; *Ledesma, supra*, 43 Cal.3d at pp. 217-218.)

17

## III

### *Cumulative Error*

Defendant asserts the foregoing alleged errors were cumulatively prejudicial and/or that the errors rendered his trial fundamentally unfair in violation of his federal and state due process rights. We reject defendant's contentions. The premise behind the cumulative error doctrine is that, while a number of errors may be harmless taken individually, their cumulative effect requires reversal. (*People v. Bunyard* (1988) 45 Cal.3d 1189, 1236-1237, disapproved on another ground in *People v. Diaz, supra*, 60 Cal.4th 1176.) We have found no error and, accordingly, there is no error to cumulate. (*In re Reno* (2012) 55 Cal.4th 428, 483 ["claims previously rejected on their substantive merits—i.e., this court found no legal error—cannot logically be used to support a cumulative error claim because we have already found there was no error to cumulate"].)

## IV

### *Section 654*

Defendant asserts the trial court erred in failing to stay execution of sentence on count four pursuant to section 654. He asserts the target felony when he committed burglary was making criminal threats. Defendant asserts that section 654 prohibits punishment for both the burglary and the target felony underlying the burglary. The Attorney General concedes the trial court should have stayed execution of the sentence imposed for making criminal threats.

We agree with the parties that the trial court erred in failing to stay execution of the sentence imposed on count four.[4] Generally, "[w]hen a defendant is convicted of

---

[4] While this appeal was pending, the Governor signed Assembly Bill No. 518 (2021-2022 Reg. Sess.), effective January 1, 2022. Assembly Bill No. 518 amended section

18

burglary and the intended felony underlying the burglary, section 654 prohibits punishment for both crimes." (*People v. Islas* (2012) 210 Cal.App.4th 116, 130.) The prosecutor and the court agreed during the jury instruction conference that the intended crime for purposes of the burglary count was making a criminal threat. The prosecutor argued this was the target crime in her closing argument. The court instructed the jurors that one of the elements of count one, burglary, was that, when defendant entered the inhabited house, "he intended to commit a criminal threat." Defendant was convicted of both first degree residential burglary and making criminal threats. Section 654 prohibits punishment for both crimes under the circumstances of this case.

In their briefing, the Attorney General and defendant state that if the matter is remanded, the matter must be remanded for consideration of the sentence as a whole under the full resentencing rule.

The "full resentencing rule allows a court to revisit all prior sentencing decisions when resentencing a defendant." (*People v. Valenzuela* (2019) 7 Cal.5th 415, 424-425, citing *People v. Buycks* (2018) 5 Cal.5th 857, 893 & *People v. Navarro* (2007) 40 Cal.4th 668, 681.) "A court conducting a full resentencing . . . may, as appropriate, revisit sentencing choices such as a decision to stay a sentence [citation], to impose an upper

---

654, subdivision (a) to provide, in pertinent part: "An act or omission that is punishable in different ways by different provisions of law *may be punished under either of such provisions*, but in no case shall the act or omission be punished under more than one provision." (Italics added.) Previously, where section 654 applied, the sentencing court was required to impose and execute the sentence that "provides for the longest potential term of imprisonment" and stay execution of the other term. (§ 654, former subd. (a).) As amended by Assembly Bill No. 518, section 654 now provides the trial court with discretion to impose and execute the sentence of either term and impose and stay the other, which could result in the trial court imposing and executing the shorter term rather than the longer term. Because we agree that the trial court erred in imposing and executing both terms, and we conclude remand is required for a full resentencing, we need not address the effect of Assembly Bill No. 518 on defendant's appeal.

term instead of a middle term [citation], or to impose concurrent instead of consecutive sentences." (*Valenzuela*, at p. 425, citing *People v. Calderon* (1993) 20 Cal.App.4th 82, 87-88, *People v. Burbine* (2003) 106 Cal.App.4th 1250, 1256-1259, & *People v. Cortez* (2016) 3 Cal.App.5th 308, 311-317.) While the trial court is entitled to reconsider the entire sentence, defendant may not be sentenced to a term in excess of his original sentence. (See *People v. Burns* (1984) 158 Cal.App.3d 1178, 1184.) Particularly in light of the court's failure to impose sentences on the misdemeanor counts, addressed in part VI of our Discussion, *post*, we agree that the matter must be remanded for full resentencing.

## V

### *Fines, Fees, and Assessments*

Relying on *People v. Dueñas* (2019) 30 Cal.App.5th 1157, defendant asserts the trial court's imposition of fines and fees without conducting an ability-to-pay hearing violated his constitutional rights. The Attorney General responds that, because the matter must be remanded for resentencing, defendant may raise his arguments addressed to fines, fees, and assessments in the trial court. We agree. Because we are remanding for full resentencing, we need not address defendant's contentions.

## VI

### *Imposition of Sentences on Misdemeanors*

With regard to the three misdemeanor offenses, the trial court stated: "I also need to address the misdemeanors in Counts 5, 6, and 7. Probation will be denied for those, and no time imposed. Probation will be denied." The Attorney General asserts it was the court's duty to impose sentences or grant probation. Therefore, the matter must be remanded for imposition of sentences on these counts.

Defendant responds that the trial court's order of "no time" is effectively a sentence of time served. However, the case on which defendant relies does not involve a trial court's failure to impose sentence. (*People v. Riolo* (1983) 33 Cal.3d 223, 225 ["The

20

sole issue raised by this appeal is appellant's right to have credited against his consecutive prison terms the days he served in custody both prior to conviction and as a condition of probation"].)  In any event, defendant acknowledges that, as the matter is to be remanded for full resentencing, the trial court will have the ability to reconsider the entire sentence.  (See, e.g., *People v. Buycks, supra*, 5 Cal.5th at p. 893.)

" 'Upon conviction it is the duty of the court to pass sentence on the defendant and impose the punishment prescribed.  [Citation.]  Pursuant to this duty the court must either sentence the defendant or grant probation in a lawful manner; it has no other discretion.' "  (*People v. Alford* (2010) 180 Cal.App.4th 1463, 1468, quoting *People v. Cheffen* (1969) 2 Cal.App.3d 638, 641-642 [citing § 12].)  The trial court was obligated to impose sentences.  Upon remand, the trial court shall impose sentences on all counts.

## VII

### *Senate Bill No. 567*

While this appeal was pending, the Governor signed Senate Bill No. 567, which made changes affecting trial courts' sentencing discretion.  On the same day defendant filed his reply brief, he filed a request for supplemental briefing on Senate Bill No. 567, and we granted defendant's request.  In supplemental briefing, defendant asserts Senate Bill No. 567, which became effective January 1, 2022, applies retroactively to his case and that the matter must be remanded for resentencing.  Defendant asserts he did not stipulate to the facts underlying the aggravating circumstances on which the trial court relied in imposing an upper term sentence, and those facts were not found true beyond a reasonable doubt by the jury or by the court at a court trial.  (See § 1170, subd. (b)(1), (2).)  The Attorney General agrees that Senate Bill No. 567 applies retroactively to defendant's case, but asserts remand is unnecessary because, in imposing the upper term sentence, the trial court properly relied on defendant's criminal history and the fact he served a prior prison term as established by certified records of conviction.  (See § 1170, subd. (b)(3).)  The Attorney General further asserts any error in sentencing defendant to

21

the upper term sentence was harmless beyond a reasonable doubt. We need not address these contentions as we are remanding the matter to the trial court for a full resentencing.

## DISPOSITION

The judgment of conviction is affirmed. The sentence is vacated and the matter is remanded for full resentencing including imposition of sentences on all counts.


/s/\
HOCH, J.


We concur:


/s/\
ROBIE, Acting P. J.


/s/\
EARL, J.


22