Filed 8/20/24  P. v. Williams CA2/6

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>DERRICK DEON WILLIAMS,<br><br>    Defendant and Appellant. | 2d Crim. No. B331744<br>(Super. Ct. No. TA148615)<br>(Los Angeles County) |

Derrick Deon Williams appeals from a judgment following a trial at which the jury found him guilty of second degree murder (Pen. Code[1], § 187, subd. (a); count 1) and possession of a firearm by a felon (§ 29800, subd. (a)(1); count 2).  The jury also found true three allegations regarding personal use of a firearm (§ 12022.53, subd. (b)-(d).)  The court sentenced appellant to 35 years to life:  15 years to life for the murder in count 1, plus 20 years for the firearm enhancement under section 12022.53,

---

[1] Undesignated statutory references are to the Penal Code.

subdivision (c).  The court stayed the punishment for the count 2 possession of a firearm by a felon.

Appellants contends (1) the prosecutor's cross-examination of him violated the Fifth Amendment privilege against self-incrimination under *Doyle v. Ohio* (1976) 426 U.S. 610 [49 L.Ed.2d 91] (*Doyle*); and (2) the court abused its discretion in allowing impeachment based on his 1992 robbery conviction.  We will affirm.

FACTUAL AND PROCEDURAL BACKGROUND

*Prosecution's Case-in-Chief*

At around midnight on February 20, 2019, Los Angeles County Sheriff deputies responded to a shooting at V Live LA, a strip club at which appellant worked as head of security.  Upon arrival, deputies saw Leland Mathews lying on his back in the parking lot.  Mathews had suffered a gunshot wound to the leg. He was transported to a hospital, where he was pronounced dead.

In conducting a protective sweep of the club, a deputy noticed streaks of blood on the floor.  The floor seemed to have been recently mopped, and mop buckets appeared to have blood in the water.  An expended bullet was found on a hallway floor. Law enforcement also recovered a bullet casing that had been thrown away.

Deputy Hector Panduro interviewed appellant in the club's parking lot.  Appellant stated he was in the staff restroom in the club's rear at the time of the incident.  He heard people "scattering."  He left the restroom and noticed a blood trail, which he followed to the club's front door.  He saw the victim on the ground of the parking lot, along with several people apparently trying to help him.  Appellant went back inside and told the

2

deejay to shut down the club. He cleared people from the club and waited outside until the police arrived.

Deputy Rayman Bailes also briefly interviewed appellant on scene. Appellant stated he was coming out of the back office at the time of the incident. Appellant heard a shot but saw nothing. He declined Bailes's invitation to add anything else.

Gary Honore testified he was a security guard who worked with others to pat down customers entering the club. Honore could not recall who patted Mathews down, but Honore was present and would have been informed if a weapon had been found. Later, Honore entered a back hallway through double doors marked for employees. He saw Mathews and appellant talking. Their demeanor was normal. Honore heard appellant say something like, "You can't be touching the bitches." Appellant and Mathews were face to face, so Honore asked them if everything was okay. Both said yes.

Honore then heard appellant say "what" and saw the two men looking at each other. Honore heard a gunshot. Honore saw appellant holding a semi-automatic handgun pointed down. Appellant and another manager told Honore and others to clean up. They did. Appellant said, "Gangsters don't snitch. If you got a problem, you gonna need that." Honore took it as a threat and felt scared. At trial, Honore was sure appellant shot Mathews.

Honore had given law enforcement statements inconsistent with his trial testimony. Honore testified he did so out of fear and for his safety. Honore was originally charged as an accessory based on the cleanup at the club. The charge was dismissed following a proffer agreement.

Surveillance video showed a member of Mathews's group slapping the buttocks area of a dancer. The dancer spoke to

3

appellant. The video showed appellant and Mathews conversing in the club's main area. The two appeared to have a heated discussion in which they were standing almost face to face. Appellant reached for Mathews's right hand or arm, but Mathews spun to break away. The two then went through double doors to a hallway. A detective testified an upside-down, L-shaped object in appellant's pants was consistent with a firearm.

The cameras did not capture the shooting itself, but they did capture Honore and other employees in the hallway. The video showed Honore and another employee flinch or otherwise react. Then, a bleeding Mathews headed out of the club, followed by appellant and other employees. The cameras later captured appellant apparently washing his hands. The video also showed him giving his jacket to another person, who took it to a vehicle in the parking lot.

Appellant gave a third interview on the morning after the shooting. Part of that interview occurred after he was advised of and waived his *Miranda*[2] rights. Appellant claimed he had never seen or "said two words" to Mathews. He indicated his jacket should still be in the club. Appellant broached the subject of gunshot residue (GSR) testing. He denied washing his hands since "this shit started."

A GSR kit obtained from appellant contained one particle characteristic of GSR. Handwashing has been shown to remove "most, if not all," GSR present on hands.

Law enforcement arrested appellant in May 2019, over two months after the shooting.

---

[2] *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694] (*Miranda*).

The deputy medical examiner testified the cause of death was a gunshot wound of the leg, and the manner of death was homicide. The bullet entered through the right thigh and exited through the right knee; the bullet then reentered on the left knee and exited from the left leg. There was also a small laceration of the right ring finger. A bullet likely caused the laceration. Mathews had a femoral blood alcohol level of .23. The examiner could not exclude the possibility of an accident based on the autopsy itself. He recalled an accidental gunshot to the leg in one case out of roughly 1200.

The parties stipulated appellant was convicted of robbery (§ 211) in 1992.

*Defense Evidence*

According to appellant, Mathews said somebody who worked in the back, Trill, owed him money. Appellant indicated he would check in the back and told Mathews not to go through the double doors. Nonetheless, Mathews followed appellant. Eventually, appellant walked toward Mathews and asked him to go back into the club. Appellant heard a pop and saw a flash. Mathews immediately turned around and walked away. Appellant realized Mathews had shot himself and wanted to "get him out of there." Once appellant was outside, appellant told the deejay to shut down the club. Appellant denied asking employees to clean up blood but acknowledged they did. He never saw a gun in Mathews's hand.

Appellant found ketchup on his jacket sleeve. The jacket was expensive, so he gave it to someone to put in his girlfriend's car. Appellant's girlfriend testified she was sleeping in her car in the club parking lot when a man placed appellant's jacket in the car.

5

Appellant admitted he lied to law enforcement about his whereabouts at the time of the shooting. He did so because he had not yet spoken with club ownership and did not know what he should do. He did not want to bring negative attention to the club and was primarily concerned with losing his job.

During appellant's cross-examination, the prosecutor repeatedly asked why appellant waited to say that Mathews accidentally shot himself. The prosecutor's questions covered the entire period from the shooting until appellant testified at trial. That period included a pretrial interval in which appellant represented himself.

### Rebuttal Evidence

The lead detective never became aware of a "Trill" during his investigation. Nor did his investigation substantiate the theory that Mathews shot himself.

## DISCUSSION

### Asserted Fifth Amendment Error

Appellant argues multiple questions posed on his cross-examination violated the Fifth Amendment privilege against self-incrimination under *Doyle, supra*, 426 U.S. 610. The People concede certain questions violated *Doyle* because they "encompassed a time period that included statements to law enforcement before receiving *Miranda* warnings, after waiving his *Miranda* rights and giving a statement, and post-*Miranda* silence following appellant's arrest . . . ." However, the People maintain any error was harmless. We agree any *Doyle* error was harmless.

In *Doyle*, the Supreme Court held that due process and fundamental fairness prevent use of a defendant's post-arrest silence following *Miranda* warnings to impeach that defendant's

6

trial testimony. (*Doyle*, *supra*, 426 U.S. at pp. 617-618.) "However, *Doyle* does not apply when a defendant presents exculpatory testimony at trial inconsistent with a voluntary post-*Miranda* statement." (*People v. Collins* (2010) 49 Cal.4th 175, 203.) Inquiry into prior inconsistent statements does not make unfair use of silence because "[a]s to the subject matter of [those] statements, the defendant has not remained silent at all." (*Anderson v. Charles* (1980) 447 U.S. 404, 408 [65 L.Ed.2d 222].)

The prosecutor properly questioned appellant's failure to disclose the claimed accidental shooting during his three pre-arrest interviews with law enforcement. *Doyle* does not apply to the first two interviews because they occurred prior to *Miranda* warnings. (*Fletcher v. Weir* (1982) 455 U.S. 603, 605 [71 L.Ed.2d 490].) Regarding the third interview, the prosecutor's questions simply highlighted the inconsistency between appellant's statements during that interview and his trial testimony. As to questions probing appellant's silence after his arrest, even assuming a *Doyle* violation, any error was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705].)

Appellant's concededly and, by virtue of the video surveillance, demonstrably false statements to law enforcement impeached his trial testimony far more than any impermissible inference drawn from silence. (See *People v. Hinton* (2006) 37 Cal.4th 839, 868; *People v. Earp* (1999) 20 Cal.4th 826, 857-858.)

Moreover, sufficient evidence establishes appellant's guilt. Honore saw Mathews and appellant speaking in proximity just before hearing a gunshot. Honore then saw appellant holding a semi-automatic handgun pointed down. He was sure appellant shot Mathews. While appellant attacked Honore's credibility,

appellant's threat against Honore explains his initial dishonesty with police.  The surveillance video also corroborates much of Honore's account, as does the existence of gunshot residue on appellant's hand despite evidence he had washed his hands.

By contrast, the evidence refutes appellant's claim that Mathews shot himself.  Honore's testimony indicated Mathews was unarmed when he entered the club.  Law enforcement did not recover a firearm from Mathews, and appellant never saw a gun in Mathews' hand.  A small laceration to Mathews' right ring finger was likely caused by a bullet, which would be inconsistent with Mathews shooting himself while holding the gun in his right hand.  Given the compelling evidence against appellant and his prior false statements, "it is clear beyond a reasonable doubt that a rational jury would have rendered the same verdict absent the [*Doyle*] error."  (*People v. Merritt* (2017) 2 Cal.5th 819, 831.)

*1992 Robbery Conviction*

Appellant asserts the trial court abused its discretion in allowing use of his 1992 robbery conviction to impeach his credibility.  We disagree.

"'Past criminal conduct involving moral turpitude that has some logical bearing on the veracity of a witness in a criminal proceeding is admissible to impeach, subject to the court's discretion under Evidence Code section 352.'"  (*People v. Smith* (2007) 40 Cal.4th 483, 512.)  Robbery is a crime of moral turpitude relevant to credibility.  (*People v. Gray* (2007) 158 Cal.App.4th 635, 641.)  We review admission of impeachment evidence for abuse of discretion to be upheld "unless the trial court 'exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.'"  (*People v. Ledesma* (2006) 39 Cal.4th 641, 705.)

8

Appellant claims his 1992 robbery conviction is too remote. "However, convictions remote in time are not automatically inadmissible for impeachment purposes. Even a fairly remote prior conviction is admissible if the defendant has not led a legally blameless life since the time of the remote prior." (*People v. Mendoza* (2000) 78 Cal.App.4th 918, 925-926.) Appellant has not led a legally blameless life since the 1992 conviction. Appellant was convicted of bringing contraband into jail in 1999 and firearm possession by a felon in 2008. He was also convicted of possessing marijuana for sale in 2018, which the trial court excluded. Appellant's convictions dating back to 1992 formed a pattern bearing on credibility.

Appellant, who was 17 years old when convicted of robbery in 1992, argues his juvenile status at the time of the offense "breaks the chain of relevance between [that] prior conviction and the present day . . . ." However, even conduct subject to a juvenile adjudication can be admissible for impeachment purposes. (*People v. Lee* (1994) 28 Cal.App.4th 1724, 1740.) Appellant's youth did not render the court's impeachment ruling an abuse of discretion.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED.

CODY, J.

We concur:

GILBERT, P. J.          YEGAN, J.

9

Laura R. Walton, Judge
Superior Court County of Los Angeles

_____

Ralph H. Goldsen, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Scott A. Taryle, Supervising Deputy Attorney General, and Lauren N. Guber, Deputy Attorney General, for Plaintiff and Respondent.