Filed 5/1/26  P. v. Williams CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>          v.<br><br>JONATHON THOR WILLIAMS,<br><br>    Defendant and Appellant. | F088458<br><br>(Super. Ct. No. BF191561A)<br><br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Kern County.  Kenneth C. Twisselman, Judge.

Sameera Ali and Brad L. Mahler, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Darren K. Indermill and Catherine Tennant Nieto, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

A jury found defendant Jonathon Thor Williams guilty of two felonies (maintaining a place for the purpose of using, selling, or giving away a controlled substance and felon in position of ammunition) and five misdemeanors (possession of cocaine, cultivating more than six marijuana plants, possession of marijuana, and two counts of child endangerment). The trial court found true three aggravating factors with respect to the felonies and sentenced Williams to a total term of 180 days in custody for the misdemeanors and formal probation for the two felonies.

On appeal, Williams argues: (1) the evidence is insufficient to support his conviction for maintaining a place for the purpose of selling, using, or giving away a controlled substance; (2) the court erred by giving CALCRIM No. 2440 without adding the word "unlawfully"; (3) the evidence is insufficient to support his conviction for felon in possession of ammunition; (4) the court prejudicially erred by informing the jury that he had a prior felony conviction; (5) the court erred by not staying under Penal Code section 654 (section 654) his misdemeanor convictions for cultivation of more than six marijuana plants and possession of more than 28.5 grams of marijuana; (6) the court erred by preventing a jury from deciding whether the three aggravating factors were true; (7) the evidence is insufficient to support the true finding on the aggravating factor of having served a prior prison term; (8) the court erred by imposing an unauthorized fee and penalty assessment on the possession of more than 28.5 grams of marijuana conviction; and (9) four clerical errors in the judgment must be corrected.

We conclude that Williams's two felony convictions must be reversed, the fee and assessment imposed for the possession of more than 28.5 grams of marijuana conviction must be reversed, either the possession of marijuana misdemeanor or the cultivating more than six marijuana plants misdemeanor must be stayed pursuant to section 654, and the four clerical errors in the judgment must be corrected. Otherwise, we affirm.

2.

## PROCEDURAL BACKGROUND

On July 14, 2023, the Kern County District Attorney filed an information that charged defendant with three felonies and five misdemeanors: felony unlawful possession for sale of cocaine (Health & Safety Code, § 11351;[1] count 1); felony opening or maintaining a place for the purpose of unlawfully selling, giving away, or using a controlled substance (§ 11366; count 2); felony felon in possession of ammunition (Pen. Code, § 30305, subd. (a)(1); count 3); child endangerment as to Doe 1 (Pen. Code, § 273a, subd. (b); count 4); child endangerment as to Doe 2 (Pen. Code, § 273a, subd. (b); count 5); cultivating more than six marijuana plants (§ 11358, subd. (c); count 6); possession of more than 28.5 grams of marijuana (§ 11357, subd. (b)(2); count 7); and possession of cocaine (§ 11350, subd. (a); count 8).

On May 14, 2024, a jury trial began.

On May 21, 2024, the district attorney filed an amended information. The amended information continued to allege the same eight counts as the previous information but added the following aggravating factors with respect to the three felony counts: Williams's prior convictions were numerous or increasing in seriousness (Cal. Rules of Court,[2] rule 4.421(b)(2)); Williams had served a prior prison term (rule 4.421(b)(3)); and Williams's prior performance while on probation was unsatisfactory (rule 4.421(b)(5)). The same day, the trial court dismissed count 8 in the interest of justice.

On May 22, 2024, the jury returned its verdict. The jury acquitted Williams on the count 1 felony but found him guilty of the lesser included offense of misdemeanor possession of a controlled substance under section 11350, subdivision (a). The jury found Williams guilty on all remaining counts (counts 2–7). The same day, the trial court

---

[1]     Unless otherwise noted, all statutory references are to the Health and Safety Code.

[2]     All references to rules are to the California Rules of Court.

3.

informed the parties that it would determine the truth of the three aggravating factors in a bifurcated proceeding and ultimately found the factors true.

On July 12, 2024, the trial court sentenced Williams. With respect to counts 2 and 3, the court suspended imposition of sentence and instead placed Williams on formal probation, with the first year of probation on both counts to be served in custody and concurrently. With respect to the five misdemeanor counts, the court denied probation, imposed a sentence of 180 days in custody for each count, and ordered each count to run concurrently with count 2. As relevant to this appeal, the court also imposed various fines and fees on count 7, including a fee of $100 under section 11372.7 and a $310 penalty assessment under various Penal Code and Government Code sections.

Williams filed his notice of appeal on August 7, 2024.

## FACTUAL BACKGROUND

On September 7, 2022, at 8:30 a.m., law enforcement from multiple agencies executed a search warrant at 17922 Castle Butte Road (the property), a site that lies in an unincorporated area of California City. The property is located in a very rural desert area of Kern County that one witness described as "pretty desolate." There are no commercial or residential properties nearby, and there is "[n]ot a lot" of traffic near the property in general. The property fronts an unpaved, bumpy, dirt road. It is on a roughly one-acre parcel that, at the time of the search, had a desert/dirt field, one large pre-fabricated house with solar panels, an RV, three camper-trailers, four greenhouses/hoop houses, and one U-Haul moving truck.

As about six law enforcement patrol vehicles and one helicopter headed towards the property, there was no other traffic. However, the helicopter observed an SUV attempting to leave the property at a "decent rate of speed." The helicopter and a patrol vehicle followed the SUV and attempted to stop it. Eventually, officers were able to effectuate a stop about eight to 10 miles from the property.

Officer Eric Craig of the Department of Fish and Wildlife conducted a high risk stop, meaning that as soon as the SUV stopped, Craig exited his vehicle with his firearm drawn and gave instructions to the SUV's occupants. Craig determined that Williams was in the front passenger seat, Williams's girlfriend Desiraee Scott was driving, and their one-year-old child and four-year-old child were in the backseat. The one year old was in an unsecured car seat, and the four year old was wearing a seatbelt. Craig did not question Williams about the property or engage Williams in conversation, but Williams did ask Craig "if this was about the marijuana." No weapons or contraband were found either in the SUV or on Williams.

Kern County Probation Officer Stephen Munoz arrived on scene and transported Williams, Scott, and the children back to the property. When Munoz saw Williams, he observed that Williams was wearing muddy shoes, even though the areas around the trailers and house were desert dry. Munoz testified that the ground around marijuana growing areas is often muddy because the marijuana plants are regularly irrigated. Munoz believed that the muddy shoes connected Williams to the marijuana growing area. Once Munoz arrived back at the property with Williams and his family, the four year old said, " 'Mommy, they're pulling your stuff out of the [U-Haul] truck' " and indicated that the stuff was "their weed."

As Williams and Scott were being apprehended, other law enforcement officers began to search the property. Officers made contact with two adults in the house[3] and found a third adult hiding in one of the trailers. In the southwest bedroom, officers found: a bag of about 29 grams of rock cocaine, five pounds of processed and bagged marijuana, four live rounds of nine-millimeter ammunition, a receipt book, and a handwritten document that purported to be a lease agreement. The handwritten lease

---

[3]     Williams told law enforcement that one of the other adults was his friend, the friend was homeless, and Williams offered to let his friend stay at the property if the friend would help clean the house.

read, "I [Scott] rent 1 acre parcel to Jose Gonzalez for the monthly amount of $1,000 in North Edwards CA 93523. [¶] First month rent to begin on 08-24-2021." The lease appears to have Scott's signature as the "landlord," but there is no signature on the line for the "tenant." The receipt book appears to have a single receipt filled out. The receipt is dated August 24, 2021; the name "Jose" is written, the amount received is $1,000, and the amount is from "Jose" to "Desiraee."

In other parts of the house, approximately three more pounds of bagged and processed marijuana were discovered. The southwest bedroom was occupied by Williams and Scott. When asked about the marijuana found in the southwest bedroom, Williams said that it was given to him by Jose, the man who rented the property for a $1,000 a month to cultivate marijuana. When asked about the cocaine, Williams in part said that it belonged to him and that he and the other adults in the house (except for Scott) used cocaine.

Also in the southwest bedroom, officers found several capacitors that were attached to solar panels. The capacitors went from the top of the ceiling to the floor and were located behind a couch. The terminals, cables, and connections leading into the capacitors were exposed and children could easily access them. That is, the wires were not covered, and the panels did not have a cover. At trial, Sergeant Dizander Guerrero opined that the solar capacitor configuration was dangerous because the wires were exposed, the terminals were facing the couch, and a touch by either an adult or a child could cause harm. Guerrero did not know if the wires or capacitors would heat up because he "did not get anywhere close to those."

In the greenhouses, which were about 20 yards long and about 20 yards from the house, officers found 816 marijuana plants in various stages of development. Officers also found pesticides and fertilizers that were scattered around the general area of the greenhouses; some were lying on the ground, others were standing upright. The

6.

pesticides and fertilizers were not on shelves and were accessible to anyone, including children.

Finally, the U-Haul truck, which was located next to the house, was rented by Scott about two days prior to execution of the search warrant. Inside the U-Haul, officers found grow paraphernalia such as netting and potting equipment, processed marijuana, and "shake," which is part of the marijuana leaves that remain after harvesting the bud/flower and that can be further processed for consumption to induce a "high." Williams admitted that he had moved the contents of the U-Haul from a smaller trailer to the larger U-Haul. Munoz opined that the items found in the U-Haul were ready to be moved.

In total, officers found about 700 pounds of processed marijuana at the property, in addition to the 816 marijuana plants. Most of the processed marijuana was found in the U-Haul. Officers did not find scales, pay-owe sheets, baggies, security cameras, or large amounts of cash at the property. The street value of the processed marijuana ranged from $400 to $1,200 per pound. When asked at trial if he had an opinion about whether the property was used for the cultivation of illegal cannabis, Guerrero testified he believed the property was "being used for the cultivation of marijuana, the sales of marijuana." Officers determined that the property, as well as the main house, greenhouses, and U-Haul belonged to Williams.

## I.    SUFFICIENCY OF THE EVIDENCE FOR COUNT 2

### A.    Parties' Arguments

Williams argues there is insufficient evidence to support his conviction on count 2 because there was no evidence that the property was opened or maintained for the purpose of selling, giving away, or using marijuana. Williams argues that none of the circumstances typically found with a section 11366 violation were discovered. Williams argues the evidence merely established a large quantity of marijuana, both growing and

processed, at the property. Because quantity alone is insufficient, Williams contends his count 2 conviction is unsupported.

The People argue that substantial evidence supports the count 2 conviction. The People argue that there was not simply a large quantity of marijuana at the property, rather, the evidence shows that Williams was growing it and preparing it to be sold. The People argue Guerrero opined that, based on the quantity of processed marijuana found, the numerous one-pound bags of marijuana found, the value of that marijuana, and the number of plants at various stages of growth, the property was used for continuously growing and selling marijuana. Alternatively, the People argue the count 2 conviction can be upheld based on the 29 grams of cocaine found in the house, along with Williams's admission that he and the other adults who lived on the property used cocaine.

## B.    Additional Background

During closing arguments, the prosecutor made the following argument with respect to count 2:

> "Count 2, [section 11366], there are two elements for this. One, [Williams] maintained a place. That place is 17922 Cattle Butte Road in California City. And that he maintained that place with the intent to sell or give away or allow others to use a controlled substance, specifically cannabis, on a continuous or repeated basis at that location.

> "Count 2, [section 11366], applies to the marijuana plants and it applies to the cannabis. Those are four different greenhouses that [law enforcement witnesses described.] We heard a lot of testimony about these greenhouses, about the marijuana plants. They're all in different stages. Directing your attention to the top-left greenhouse, that's at the beginning stage. Sergeant Guerrero … walked us through the different stages. Those are the baby ones they're growing. Then you have the second, third and fourth photo in more mature stages. And then from there, you get the cannabis, that bud. And Sergeant Guerrero testified … that's what individuals are selling. That's what [Williams] sells. That's the bud that comes from the marijuana plants.

"When [Warden] Craig made that stop, stopped that vehicle the defendant was in, while being handcuffed, [Williams] says, 'Is this about the marijuana?' He knew exactly what was going on.

"That's the U-Haul with all the plastic bags, the trash bags that are filled with a lot of turkey bags. Turkey bags being on the left-hand side, which are about one pound of cannabis inside of it. The total pounds of cannabis located was over 700 pounds. That means that those turkey bags that we are looking at, 700 pounds of that—of cannabis product in the U-Haul ready to be transported, ready to be moved out of the property, ready to be sold, ready to be given away. Is this about the marijuana? It is.

"The second element—the first and second, maintain that place to give away or sell the cannabis. Again, we heard testimony from Sergeant Guerrero about the fertilizers, the irrigation system, how it connects to each pod that the marijuana plant is in. That is continuously being maintained. They're continuously being watered and then trimmed and then transported elsewhere.

"Count 2 has also been met. All the elements have been satisfied based on the evidence, based on the testimony of all the witnesses, Sergeant Guerrero's opinion and everything that was located including the greenhouses. I believe the total of 816 marijuana plants and over 700 pounds of processed cannabis ready for transportation."

## C. Legal Standards

### 1. Sufficiency of the Evidence to Support a Conviction

" 'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence which is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Cardenas* (2025) 18 Cal.5th 797, 821.) " 'Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence.' " (*People v. Brooks* (2017) 3 Cal.5th 1, 57.) Appellate courts presume in support of the judgment every fact that the trier of fact could reasonably deduce from the evidence. (*People v. Oyler* (2025) 17 Cal.5th 756, 820.) Appellate courts also properly consider erroneously admitted evidence,

notwithstanding the erroneous admission. (*Cardenas*, at p. 821.) However, appellate courts do not resolve credibility issues or evidentiary conflicts. (*People v. Jackson* (2014) 58 Cal.4th 724, 749.) A judgment will not be reversed for insufficiency of the evidence merely because the circumstances may also be reasonably reconciled with a conclusion contrary to the judgment. (*Oyler*, at p. 820.)

### 2. Maintaining/Opening a Place to Sell, Use, or Give Away Drugs

Under California law, "[e]very person who opens or maintains any place for the purpose of unlawfully selling, giving away, or using any controlled substance [as identified in particular sections of the Health and Safety Code] shall be punished by imprisonment in the county jail for a period of not more than one year or the state prison." (§ 11366; *People v. Franco* (2009) 180 Cal.App.4th 713, 718 (*Franco*); *People v. Vera* (1999) 69 Cal.App.4th 1100, 1102 & fn. 2.) Because of the disjunctive "or," section 11366 "does not require that the place be maintained for the purpose of selling; it can be violated without selling, merely by providing a place for drug abusers to gather and share their experience." (*People v. Green* (1988) 200 Cal.App.3d 538, 544; see *Vera*, at p. 1102.) Section 11366 proscribes continuously selling, giving away, or using a controlled substance; a single or isolated instance of this forbidden conduct is insufficient. (*Franco*, at p. 718; *Vera*, at p. 1102; *People v. Shoals* (1992) 8 Cal.App.4th 475, 490 (*Shoals*).) Further, section 11366 is violated by selling or giving away to others, or allowing others to use, a controlled substance in a "place" maintained or opened for that purpose; it is not violated by an individual's repeated personal use of a controlled substance at his home. (*Franco*, at p. 716; *Vera*, at pp. 1102–1103; see also *Shoals*, at p. 492.)

In determining whether "a place" is opened or maintained for the purpose of selling, giving away, or using a controlled substance, the trier of fact should consider the surrounding circumstances, including: the quantity of any controlled substance discovered; the character of the place opened or maintained; how the place is "fitted up";

10.

whether other individuals visited the place in unusual numbers or at unusual times; whether other individuals who were under the influence of a controlled substance were found at the place; whether lookouts were posted near or at the place; whether a password or passcode was needed for entry into the place; any pertinent statements by the defendant or those found at the premises; and whether any drug paraphernalia or drug residue was found in the place. (See *Franco*, *supra*, 180 Cal.App.4th at p. 726; *People v. Hawkins* (2004) 124 Cal.App.4th 675, 683; *Shoals*, *supra*, 8 Cal.App.4th at pp. 491–492; see also *People v. Cannon* (1957) 148 Cal.App.2d 163, 168.) However, the quantity of controlled substance discovered at a place is alone insufficient to show that the place was maintained or opened for the purpose of continuously selling, giving away, or using a controlled substance. (*Shoals*, at pp. 491–492.)

## D. Analysis

Viewing the evidence in the light most favorable to the verdict (*People v. Cardenas*, *supra*, 18 Cal.5th at p. 821), and making all reasonable inferences in support of the verdict (*People v. Oyler*, *supra*, 17 Cal.5th at p. 820), we are not satisfied that sufficient evidence supports count 2.

There is no doubt the evidence demonstrated that marijuana was being grown, cultivated, and processed in significant quantities at the property. Officers discovered 700 pounds of processed marijuana, including five pounds in Williams's bedroom and three pounds in an undisclosed part of the house, as well as 816 marijuana plants in various stages of growth at the property. It appears that the only things being grown in the greenhouses were marijuana plants, and the marijuana plants were receiving irrigated water, fertilizer, and pesticides to sustain their growth. Williams admitted that the property was used by "Jose" to grow and cultivate marijuana, and the August 2021 handwritten "lease" and corresponding receipt indicate that the growth and cultivation had been going on for numerous months prior to the search. Together, this evidence

11.

indisputably established that the property was being used, and had been used for some time, to grow and cultivate marijuana.

The problem is that section 11366 prohibits opening or maintaining a place for the purpose of selling, using, or giving away a controlled substance; it does not prohibit opening or maintaining a place for the purpose of growing or cultivating a controlled substance/marijuana. (Cf. § 11366 with 11358 [prohibiting the cultivation of marijuana]; 11366.5 [prohibiting individuals from making available a premises for the manufacture of a controlled substance]; cf. also *People v. Dowl* (2013) 57 Cal.4th 1079, 1086 [describing separate criminal provisions that are exempt from prosecution pursuant to the Medical Marijuana Program of § 11362.7 et seq.].)

Based primarily on *Shoals*, courts have identified a number of circumstances that could be considered in determining whether a section 11366 violation has occurred. (E.g., *Franco*, *supra*, 180 Cal.App.4th at p. 726; *Shoals*, *supra*, 8 Cal.App.4th at pp. 491–492.) We cannot say that any of those considerations sufficiently support Williams's conviction. First, the character of the property was not indicative of a place where marijuana was given to, used by, or sold to others. It was located on an isolated and desolate patch of Kern County desert. The property was not even on a paved road, and there appears to have been a distinct absence of nearby neighbors or businesses. There were greenhouses, one livable house, and what appear to be three abandoned trailers. There were multiple greenhouses that were growing marijuana plants at various stages of development, and there were fertilizers and pesticides scattered around the greenhouses. The character of the property was that of a rural and isolated farmstead.

Second, the property was fitted up for the growth and cultivation of marijuana, not for the sale of marijuana. Items were found that would be expected for the growth and cultivation of marijuana, but items that are commonly associated with drug sales were not discovered. Specifically, officers testified that they did not find any scales, pay-owe

12.

sheets,[4] significant sums of cash, firearms, or any type of security at the property. Third, there is no evidence that any lookouts were posted, and there is no evidence that any kind of password was associated with the property. Fourth, there is no evidence that the property experienced any degree of regular visitors, let alone visitors at odd hours or in unusually high numbers. Fifth, there is no evidence that anyone found on the property was under the influence of marijuana.

Sixth, Williams admitted the property was used for marijuana cultivation, although he tried to deflect responsibility for that cultivation to "Jose." Williams also spontaneously asked Craig whether "this was about the marijuana." However, that statement appears to be an acknowledgement that there was processed and growing marijuana throughout the property; the statement did not mention or intimate that marijuana was continuously being used by, sold to, or given away to others at the property. Seventh, and finally, there was a substantial quantity of processed marijuana found at the property, about 700 pounds. Such a quantity is not consistent with personal use. However, the quantity of marijuana alone cannot support a section 11366 conviction (*Shoals*, *supra*, 8 Cal.App.4th at p. 492), and the fact that a large quantity was found is hardly surprising, considering that the property was used to cultivate and process marijuana.

Additionally, the place where most of the 700 pounds was discovered is highly significant. Most of the processed marijuana was discovered in the U-Haul. Munoz opined that the marijuana was placed in the U-Haul in order to be transported. This opinion is consistent with the commonly known use of U-Haul moving trucks. Therefore, while the processed marijuana was clearly going to be disposed of in some fashion (sold or perhaps given away) because it was being transported in the U-Haul, the

---

**4**  Although a book of receipts was found, it appears that only one receipt was filled out and that was to Jose Gonzalez and dated August 24, 2021.

13.

marijuana was going to be transported *away from* and thus, disposed of at a place *other than* the property.

Section 11366 requires that a controlled substance be sold, used, or given away *at* "the place" maintained for such a purpose. (§ 11366; *Shoals*, *supra*, 8 Cal.App.4th at p. 491 ["The prosecution must prove that appellant opened or maintained [hotel] room 219 for the purpose of selling the cocaine base."]; *People v. Holland* (1958) 158 Cal.App.2d 583, 588 ["There is no evidence that this barbecue stand was opened for the prohibited purpose."].) Section 11366 simply does not address controlled substances that are sold, used, or given away at a location other than "the place," even if the controlled substance is produced at "the place." (§ 11366.) Accordingly, *Shoals* and related considerations do not support the conclusion that the property was used for the purpose of continuously selling, using, or giving away marijuana to others.

It is true that Guerrero opined that the property was used for marijuana cultivation and sales. However, the question and basis for this opinion are significant. During his direct examination, the following exchange with the prosecutor occurred:

> "[Prosecutor]: Did you form an opinion as to whether the defendant was using the property for illegal cannabis cultivation?
>
> "[Guerrero]: Yes.
>
> "[Prosecutor]: And what was that opinion?
>
> "[Guerrero]: That the property was being used for the cultivation of marijuana, the sales of marijuana.
>
> "[Prosecutor]: What is that opinion based on?
>
> "[Guerrero]: It's based on the amount of marijuana plants that were located, how they were located, the cultivation process, the pesticides, fertilizers located at the property as well as the end product, over 700 pounds of processed marijuana."

As the excerpt shows, the question asked for Guerrero's opinion about whether the property was being used to cultivate marijuana, it did not ask about sales. Moreover, the

14.

basis of the opinion revolved around considerations that are relevant to cultivation—fertilizers, pesticides, the location of marijuana plants, and an apparent cultivation process. Those considerations are not indicative of a place where marijuana is sold. Guerrero did mention the 700 pounds of processed marijuana that was discovered. However, Guerrero did not explain why that quantity was consistent with selling marijuana as compared to cultivating marijuana at the property. Further, we fail to see how combining that quantity of marijuana with evidence that only demonstrated marijuana was being cultivated at the property can be sufficient to demonstrate that marijuana was continuously sold to others at the property. (*Shoals*, *supra*, 8 Cal.App.4th at p. 492 [explaining that quantity *alone* cannot support a conviction under section 11366]; cf. *People v. Cannon*, *supra*, 148 Cal.App.2d at p. 168 [describing the circumstantial evidence to support a section 11366 conviction based on heroin sales occurring at an apartment].) Therefore, Guerrero's opinion either improperly conflates marijuana cultivation with marijuana sales, or it relies on a factor (quantity) that alone cannot support a section 11366 conviction. (*Shoals*, at pp. 491–492.) Either way, Guerrero's testimony is not substantial evidence that Williams used the property for the purpose of continuously selling, using, or giving away marijuana to others.

Similar to Guerrero's opinion, the prosecutor's closing argument seems to improperly treat cultivation as synonymous with selling, using, or giving away and thus, prohibited by section 11366. To prove that Williams violated section 11366, the prosecutor described the 816 marijuana plants in various stages of growth that were found in the greenhouses, the fertilizers and irrigation system in place at the property, and the 700 pounds of processed marijuana found at the property. Again, as discussed above, this evidence does not support any of the *Shoals* considerations and is indicative of growing and cultivating marijuana at the property, but not selling, using, or giving away marijuana at the property.

Additionally, the prosecutor's closing argument specifically noted the contents of the U-Haul. The prosecutor stated, "That means [the 700 pounds] of cannabis product in the U-Haul ready to be transported, ready to be moved out of the property, ready to be sold, ready to be given away." This statement is a recognition by the prosecutor herself that, although the marijuana was being grown, cultivated, and processed at the property, the marijuana was actually being transported to a location other than the property to be sold or given away. Such conduct does not violate section 11366 because the "place opened or maintained" must be the place where the controlled substance is continuously sold, used, or given away. (§ 11366; *Shoals*, *supra*, 8 Cal.App.4th at p. 491; *People v. Holland*, *supra*, 158 Cal.App.2d at p. 588.)

Finally, the People argue that even if insufficient evidence supports the count 2 conviction based on marijuana/cannabis as the controlled substance, the amount of cocaine found, combined with Williams's admission that everyone (except Scott) used cocaine at the property, is sufficient to support the count 2 conviction. The People fail to cite any authority in support of this argument.

This argument is contrary to well-established California and United States Supreme Court authority. Simply put, a conviction cannot be constitutionally sustained on the basis of a theory that was not actually presented to the jury. (*Jackson v. Virginia* (1979) 443 U.S. 307, 314; *Cole v. Arkansas* (1948) 333 U.S. 196, 202; *People v. Kunkin* (1973) 9 Cal.3d 245, 251; *People v. Zemek* (2023) 93 Cal.App.5th 313, 340; *People v. Garcia* (2014) 224 Cal.App.4th 519, 525.) Here, the instructions informed the jury that the controlled substance at issue was cannabis; cocaine was not mentioned. Therefore, Williams's conviction cannot be sustained based on the cocaine discovered at the property. (*Jackson*, at p. 314; *Cole*, at p. 202; *Kunkin*, at p. 251; *Zemek*, at p. 340; *Garcia*, at p. 525.)

In sum, the evidence shows the property was used to grow, cultivate, and process marijuana, but that is all. Substantial evidence does not support the section 11366

16.

conviction because there is insufficient evidence that Williams maintained the property for the purpose of continuously selling, using, or giving away marijuana at the property.[5] (*Shoals*, *supra*, 8 Cal.App.4th at pp. 491–493.)

## II.  SUFFICIENCY OF THE EVIDENCE FOR COUNT 3

### A.  Parties' Arguments

Williams argues that substantial evidence does not support his conviction on count 3 for felon in possession of ammunition.  Williams argues that his prior felony under section 11359 was reduced to a misdemeanor and sealed.  As a result of the resentencing and sealing, Williams argues that the prior felony is no longer a felony and cannot be used to support his conviction.  Because he has no other prior felony convictions, Williams argues that the count 3 conviction is unsupported and must be reversed.

The People agree that the count 3 conviction must be reversed.  The People concede that, because Williams's prior felony conviction was dismissed and sealed prior to trial, that conviction cannot be used to support the count 3 conviction.

### B.  Additional Background

On May 27, 2016, Williams pled guilty in Riverside County to felony possession of marijuana in violation of section 11359.[6]

On January 20, 2023, the Riverside County Superior Court dismissed and sealed the prior conviction in accordance with sections 11361.8 and 11361.9.

---

[5]  Because we find the evidence insufficient to support the count 2 conviction, we do not address Williams's argument that the trial court erred by failing to insert the term "unlawfully" in its CALCRIM No. 2440 instruction.

[6]  Williams requests that we take judicial notice of legislative history relating to section 11361.9 and documents from the Riverside County Superior Court related to the prior felony, including a change of plea hearing and a resentencing order under section 11361.8.  The People do not object to the request, and we find that the request is appropriate.  Accordingly, Williams's request for judicial notice filed on August 8, 2025, is granted.  (Evid. Code, § 452; rule 8.252.)

17.

At trial on May 15, 2024, Williams argued for the dismissal of count 3. Williams argued that, through operation of section 11361.8, his prior felony was reduced to a misdemeanor, became legally invalid, and thus, he was no longer a felon. The prosecutor conceded that Williams's prior felony had been reduced to a misdemeanor. However, the prosecutor argued that it was inappropriate to dismiss count 3 because, when the original complaint was filed on September 9, 2022, the prior felony had not been reduced and Williams was still considered a felon at that time. The trial court denied the motion and essentially agreed with the prosecutor. The court found that because Williams's conviction was a felony at the time the offense was committed on September 7, 2022 (and when the original complaint was filed on September 9, 2022), and because he allegedly possessed ammunition when that conviction had not yet been reduced, dismissal of count 3 for felon in possession of ammunition was improper.

## C.    Legal Standard

In 2016, voters approved Proposition 64, which, among other things, generally reduced marijuana-related crimes from felonies to misdemeanors, including the offense of possession under section 11359. (*People v. Smit* (2018) 24 Cal.App.5th 596, 599, 600.) Proposition 64 also added section 11361.8, which provides a mechanism to obtain relief for those currently serving a sentence, or for those who had completed a sentence, for a marijuana offense affected by Proposition 64. (See *People v. Jessup* (2020) 50 Cal.App.5th 83, 88; *People v. Saelee* (2018) 28 Cal.App.5th 744, 751.) For those qualifying defendants who have completed a sentence, "the court shall redesignate the conviction as a misdemeanor or infraction or dismiss and seal the conviction as legally invalid …." (§ 11361.8, subd. (f); *People v. Taylor* (2021) 60 Cal.App.5th 115, 120, fn. 3.) Further, the Legislature has provided that a "conviction … that has been ordered sealed pursuant to [s]ection 11361.8 is deemed never to have occurred, and the person may reply accordingly to any inquiry about the events." (§ 11361.9, subd. (f).)

## D.    Discussion

The parties agree that count 3 is unsupported due to operation of sections 11361.8 and 11361.9.  We agree with the parties.

The Riverside County Superior Court filed an order on January 20, 2023, that dismissed and sealed Williams's prior felony.  By operation of sections 11361.8, subdivision (f) and 11361.9, subdivision (f), his prior felony is legally invalid, and is deemed never to have occurred.  Under such circumstances, that conviction cannot support the prior felony conviction element of Penal Code section 30305.  Accordingly, insufficient evidence supports the count 3 conviction for felon in possession of ammunition.[7]

## III.    EFFECT OF INFORMING THE JURY OF A PRIOR CONVICTION

### A.    Parties' Arguments[8]

Williams argues that because the trial court refused to dismiss the count 3 charge, he stipulated that he had suffered a prior felony conviction, and the stipulation was improperly read to the jury.  Williams argues the prosecutor knew that she did not have a felony conviction due to operation of sections 11361.8 and 11361.9, yet she still pursued the count 3 charge and relied on the stipulation to prove the prior felony element.  Williams argues the admission of the nonexistent felony conviction violated his constitutional due process rights, and it cannot be determined that the violation was harmless beyond a reasonable doubt.  Williams contends that the error was prejudicial

---

[7]    The sentence originally imposed in this case included terms for felony counts 2 and 3, and all misdemeanor counts were ordered to run concurrently to count 2.  As a result of this opinion, however, the circumstances have changed in that counts 2 and 3 have been reversed.  In light of these changed circumstances, we will vacate Williams's sentence and remand the matter for a full resentencing.  (See *People v. Buycks* (2018) 5 Cal.5th 857, 893.)

[8]    The parties' briefing addresses harm with respect to counts 2 through 6.  Because we have determined that counts 2 and 3 are not supported by sufficient evidence, we limit our discussion of harm to counts 4, 5, and 6.

because (1) evidence of a prior conviction is inherently prejudicial, (2) the evidence to support counts 4 and 5 was not strong, (3) he denied participating in the marijuana grow, and (4) there were four other adults living at the property. Due to the harm from the unconstitutional disclosure of the nonexistent prior conviction, Williams argues that counts 4, 5, and 6 must be reversed.

The People agree that reading the stipulation to the jury was error. However, the People argue the error amounts to no more than an evidentiary error under state law. The People argue the error was not prejudicial because the evidence supporting counts 4, 5, and 6 was substantial and the limiting instruction directed the jury to not consider the conviction for any purpose other than to establish the first element of count 3.

## B.     Additional Background

After the trial court ruled his prior conviction was admissible for count 3, Williams entered into a stipulation to be read to the jury.[9] Immediately before the prosecutor rested her case in chief, the court read to the jury the following stipulation: "Ladies and gentlemen of the jury, as additional evidence, the People are offering the stipulation as to fact. I'm going to read that stipulation to you. Make notes as you wish as I read this to you. [¶] … [¶] The defendant and the People have stipulated or agreed that the defendant was previously convicted of a felony. This stipulation means that you must accept this fact as proved."

The parties' specific stipulation was noted one time in the jury instructions. With respect to the count 3 instruction, which was CALCRIM No. 2591, the jury was informed: "The defendant and the People have stipulated or agreed that the defendant was previously convicted of a felony. This stipulation means that you must accept this

---

[9]     We note that because Williams agreed to the stipulation after the trial court overruled his objection to use of the prior felony, the "stipulation served to control the form of the evidence, not to concede admissibility." (*People v. Bacigalupo* (1991) 1 Cal.4th 103, 139.) Therefore, Williams's stipulation did not waive the error. (*Ibid*.)

fact as proved. Do not consider this fact for any other purpose. Do not speculate or discuss the nature of the conviction."

Finally, during closing argument, the prosecutor discussed count 3 and informed the jury that the first element of that offense, which is that Williams was a felon, was met through the stipulation. The prosecutor explained: "I'll start with the easy one. Defense and People stipulated to that fact. Defendant does have a prior felony. You don't have to deliberate on that. You don't have to discuss it. It's met." The prosecutor did not mention the stipulation again during closing arguments.

## C. Legal Standards

### 1. Penal Code section 273a–Child Endangerment

In part, Penal Code section 273a provides for a misdemeanor offense if a person, who has care or custody of a child, willfully causes or permits the child to be placed in a situation where the child's person or health may be endangered. (Pen. Code, § 273a, subd. (b); *People v. Perez* (2008) 164 Cal.App.4th 1462, 1468.) Because parents and caretakers sometimes make mistakes that are detrimental to a child's health, a violation of section 273a will occur only if the defendant's conduct rises to the level of criminal negligence. (*People v. Deskin* (1992) 10 Cal.App.4th 1397, 1402–1403.) Criminal negligence is " ' "aggravated, culpable, gross, or reckless … conduct … [that is] such a departure from what would be the conduct of an ordinarily prudent or careful [person] under the same circumstances as to be incompatible with a proper regard for human life …." ' " (*People v. Valdez* (2002) 27 Cal.4th 778, 783; *People v. Sargent* (1999) 19 Cal.4th 1206, 1215.) Criminal negligence requires actual or constructive knowledge of a risk and is generally determined by asking whether a reasonable person in the defendant's position would have been aware of the risk. (See *Valdez*, at p. 783; *Sargent*, at p. 1215; *Williams v. Garcetti* (1993) 5 Cal.4th 561, 574.)

### 2. Section 11358–Cultivation of More Than Six Marijuana Plants

Under California law, every adult who plants, cultivates, harvests, dries, or processes more than six living cannabis plants may be imprisoned in a county jail for no more than six months, fined not more than $500, or both. (§ 11358, subd. (c); *People v. Boatwright* (2019) 36 Cal.App.5th 848, 853.) Thus, as long as a defendant knows that he is dealing with a cannabis plant, section 11358 is violated if the defendant plants, cultivates, harvests, dries, or processes the requisite number of cannabis plants. (*People v. Tierce* (1985) 165 Cal.App.3d 256, 266–267; CALCRIM No. 2370.)

### D. Analysis

### 1. Nature of the Error

The parties agree the trial court erred by reading the stipulation and informing the jury that Williams was a convicted felon. However, the parties do not agree on the nature of the error or what harmless error analysis is to be applied. If the error is one that violated Williams's federal constitutional rights, then harm is assessed under the *Chapman* standard,[10] which asks whether the error was " 'harmless beyond a reasonable doubt.' " (*People v. Hendrix* (2022) 13 Cal.5th 933, 942). If the error is one of state law that did not rise to a violation of a federal constitutional right, then harm is assessed under the *Watson* standard,[11] which asks whether "it is 'reasonably probable' the outcome would have been different in the absence of the error." (*People v. Lynch* (2024) 16 Cal.5th 730, 755 (*Lynch*).)

Citing *People v. Hall* (1998) 67 Cal.App.4th 128 (*Hall*), the People argue the error is a state law evidentiary error that is subject to a harmless error analysis under *Watson*. In *Hall*, the trial court informed the jury that the defendant was a "convicted person" for

---

[10] The "*Chapman* standard" refers to the harm standard announced in *Chapman v. California* (1967) 386 U.S. 18.

[11] The "*Watson* standard" refers to the harm standard announced in *People v. Watson* (1956) 46 Cal.2d 818.

purposes of establishing an element of Penal Code section 12025, subdivision (a)(1). (*Hall*, at p. 134.) However, being a previously convicted person was a sentencing factor and not an element of a Penal Code section 12025 offense. (*Hall*, at pp. 134–135.) *Hall* conducted a harmless error analysis under *Watson* and found that informing the jury that defendant was a "convicted person" was harmless. (*Hall*, at pp. 135–136.)

In contrast, Williams cites several federal cases that deal with either the knowing use of false evidence (*Napue v. Illinois* (1959) 360 U.S. 264), the admission of a constitutionally invalid prior conviction (*Burgett v. Texas* (1967) 389 U.S. 109 (*Burgett*)), or "retroactive misjoinder" or "spillover prejudice" (*United States v. Aldrich* (8th Cir. 1999) 169 F.3d 526 (*Aldrich*)).

In *Burgett*, the jury was informed of a prior conviction that was obtained in violation of the Sixth Amendment. (*Burgett*, *supra*, 389 U.S. at pp. 112, 114–115.) Despite an instruction from the trial court to ignore the prior conviction for all purposes, *Burgett* could not find that use of the prior conviction was harmless beyond a reasonable doubt. (*Id*. at pp. 113, 115; cf. *In re Terry* (1971) 4 Cal.3d 911, 916 [finding that informing the jury of a conviction obtained in violation of the Sixth Amendment right to confrontation was error but that the error was harmless beyond a reasonable doubt].)

In *Aldrich*, the defendant was convicted of one count of violating 26 United States Code section 5861 (possession of a sawed-off shotgun) and two counts of 18 United States Code section 922 (felon in possession of a firearm and ammunition). (*Aldrich*, *supra*, 169 F.3d at p. 527.) To show the defendant was a felon, the prosecutor introduced evidence that the defendant had been convicted in 1976 of a felony in Iowa. (*Ibid*.) After trial, it was learned that the State of Iowa had issued the defendant a "Restoration of Rights" certificate in 1981. (*Ibid*.) This certificate had the effect of nullifying the 1976 felony conviction. (*Id*. at pp. 527–528.) The parties agreed that the certificate defeated the two felon in possession convictions, but disagreed about whether the sawed-off shotgun conviction could stand due to prejudice from the jury learning that the defendant

23.

was a convicted felon. (*Id*. at pp. 528–529.) *Aldrich* viewed the case as a classic example of "retroactive misjoinder," which occurs " 'when joinder of multiple counts was proper initially, but later developments … render the initial joinder improper.' " (*Aldrich*, at p. 528; see also *In re Ponce de Leon* (2004) 117 Cal.App.4th 1116, 1121.) When there is a retroactive misjoinder, there is a danger that prejudice from evidence that is only relevant to a dismissed or reversed count spills over and improperly taints the remaining counts. (See *Aldrich*, at p. 528; *Ponce de Leon*, at p. 1121.) The Eighth Circuit reversed the sawed-off shotgun conviction and held that introduction of the invalid felony conviction was highly inflammatory and constituted "clear prejudice."[12] (*Aldrich*, at pp. 528–529.) In the context of "retroactive misjoinder," other federal courts have described the prejudice necessary to overturn a conviction as "compelling prejudice." (*United States v. Lazarenko* (9th Cir. 2009) 564 F.3d 1026, 1043–1045; *United States v. Hamilton* (2d Cir. 2003) 334 F.3d 170, 182.)

Finally, *Napue* established that "a conviction obtained through the use of false evidence, known to be such by [the prosecutor]," violates the Fourteenth Amendment right to due process. (*Napue v. Illinois*, *supra*, 360 U.S. at p. 269; see *People v. Sakarias* (2000) 22 Cal.4th 596, 633.) A *Napue* violation can occur even if the false evidence was not intentionally submitted (*People v. Morrison* (2004) 34 Cal.4th 698, 716), and federal circuit courts have found that a "knowing" use of false evidence may occur if the prosecutor knows or should have known that the evidence used is false. (E.g., *Hampton v. Shinn* (9th Cir. 2025) 143 F.4th 1047, 1068; *United States v. Ausby* (D.C. Cir. 2019) 916 F.3d 1089, 1092; see also *Morrison*, at p. 716.) If a *Napue* violation is established,

---

**12**    Although the analysis in *Aldrich* did not emphasize the point, the defendant was arrested in a car that belonged to a third party, the sawed-off shotgun was found behind the driver's seat of the car, and the sawed-off shotgun was owned by the third party. (*Aldrich*, *supra*, 169 F.3d at p. 527.) Therefore, the Eighth Circuit's factual recitation could support an argument the defendant did not know that the sawed-off shotgun was in the car and thus, he did not knowingly possess the sawed-off shotgun.

24.

reversal is required if the false evidence was "material" to the judgment (*Hampton*, at p. 1068), which essentially means that the prosecution must establish harmlessness beyond a reasonable doubt (*Glossip v. Oklahoma* (2025) 604 U.S. 226, 228).

While these four cases share similarities to this case, they are also distinguishable to a certain degree. *Hall* is distinguishable because there was no indication that the prior felony conviction in that case was somehow invalid. *Burgett* is distinguishable because the conviction here is infirm due to the operation of state law, not through a violation of the federal constitution.[13] *Aldrich* is very close to this case, but it appears that both the prosecutor and the defense counsel were unaware of the "Restoration of Rights" certificate at the time of trial (*Aldrich*, *supra*, 169 F.3d at p. 527), whereas the trial court and the parties were aware of the Riverside County Superior Court's order during trial. Finally, *Napue* is not clearly controlling because of how the term "false evidence" is commonly understood. The term readily brings to mind something like perjurious testimony (*Glossip v. Oklahoma*, *supra*, 604 U.S. at p. 246 [discussing a *Napue* violation in terms of "false testimony"]), or forged or fraudulent documents (*Chessman v. Teets* (1955) 350 U.S. 3, 3–4 [allegations that prosecutor and court reporter created a fraudulent transcript raised a valid Fourteenth Amendment claim]). That is, evidence that has no basis in fact and that is entirely made up. In contrast, the prior felony has a basis in actual fact because it is literally true that Williams was convicted of violating section 11359.

Moreover, the prosecutor in this case recognized that the Riverside County Superior Court had reduced and sealed Williams's conviction and then made a legal

---

[13] Of course, harm from state law errors is reviewed under the *Watson* standard, while harm from federal constitutional errors is reviewed under the *Chapman* standard. (*Lynch*, *supra*, 16 Cal.5th at p. 755.)

argument that count 3 could still be pursued based on that conviction.[14]  Specifically, the prosecutor argued the prior felony should not be excluded because the Riverside Superior Court order had not yet been signed when the complaint had been filed.  We view this argument as one that essentially attempted to address defense counsel's reliance on section 11361.8.[15]  Williams cites no authority, and we are aware of none, which indicates that a *Napue* violation may occur based on a prosecutor's attempt to make legal arguments that either address or distinguish a statutory provision and an opponent's argument based on that statutory provision.  Therefore, none of the cases cited by the parties appear to be squarely on point.

We recognize that the error committed in this case is significant.  However, California law does not require a strict *Chapman* harmless error analysis when state law has been violated or misapplied and, as a result, a prior conviction was erroneously disclosed to the jury.  (E.g., *People v. Johnson* (2022) 12 Cal.5th 544, 611 [assuming erroneous admission under Evidence Code section 1101 and analyzing the error under the *Watson* standard]; *People v. Gabriel* (2012) 206 Cal.App.4th 450, 459–460 [assuming erroneous impeachment through a felony involving moral turpitude and analyzing harm

---

[14]     The trial court, the prosecutor at a hearing outside the presence of the jury, and Williams in his supplemental briefing to us, all stated that his felony conviction was reduced to a misdemeanor.  However, the actual order from the Riverside County Superior Court reads that the conviction was *dismissed* and sealed, not *reduced* and sealed.  Under section 11361.8, a prior felony conviction may be reduced to a misdemeanor *or* dismissed and sealed.  (§ 11361.8, subd. (f).)  Because the Riverside County Superior Court's order dismissed and sealed Williams's conviction, it was not reduced to a misdemeanor.

[15]     Williams makes arguments before us based in part on section 11361.9.  However, in the trial court, Williams's counsel only cited to section 11361.8 and never mentioned section 11361.9.  By failing to cite section 11361.9 to either the prosecutor or the trial court, Williams deprived them of the ability to address during trial any issues associated with section 11361.9.  (Cf. *People v. Nieves* (2021) 11 Cal.5th 404, 446 [failure to raise an issue before the trial court forfeits the issue on appeal]; *People v. Goldman* (2014) 225 Cal.App.4th 950, 960 [same].)

under the *Watson* standard]; *People v. Felix* (1999) 70 Cal.App.4th 426, 432–433 [erroneously admitting evidence of a prior conviction through Evidence Code section 1102 and using the *Watson* standard]; *Hall*, *supra*, 67 Cal.App.4th at pp. 135–136 [reviewing the admission of a prior conviction under the *Watson* standard when a prior conviction was erroneously identified as an element of an offense].)

Further, in terms of *Napue*, we think that there is a fundamental distinction between a prosecutor who simply makes an erroneous legal argument regarding the application or interpretation of a state law and a prosecutor who knowingly uses fabricated evidence without correction. The former involves an advocate's attempt to navigate uncertain questions of state law, while the latter involves the use or manufacture of fraudulent evidence. In other words, one fits within and is encouraged by our adversarial system of justice, while the other is a perversion that falls outside the bounds of our system. In light of these considerations, as well as the above cases, we believe the error at issue is one of misapplication of state law that arose from an erroneous legal argument by the prosecutor. As such, this case does not involve *Napue* error, rather we conclude it involves a retroactive misjoinder through the misapplication of state law. (Cf. *Aldrich*, *supra*, 169 F.3d at pp. 528–529; *In re Ponce de Leon*, *supra*, 117 Cal.App.4th at p. 1121.)

The Second Circuit Court of Appeal has explained that the "clear prejudice" or "compelling prejudice" necessary to demonstrate a harmful error in a retroactive misjoinder case is determined by assessing "the likelihood that the jury, in considering one particular count …, was affected by evidence that was relevant only to a different count …." (*United States v. Hamilton*, *supra*, 334 F.3d at p. 182.) Although establishing "compelling prejudice" has been described as an " 'extremely heavy burden' " (*United States v. Simels* (2d Cir. 2011) 654 F.3d 161, 171), we are satisfied that *Watson*'s reasonable probability of a different outcome standard is sufficient to assess "the likelihood that the jury … was affected by evidence that was relevant only to a [reversed

count]." (*Hamilton*, at p. 182.) Therefore, we will review whether the admission in violation of state law of evidence concerning the prior felony harmed Williams under the *Watson* standard. (Cf. *Hall*, *supra*, 67 Cal.App.4th at pp. 135–136.)

### 2. Harm

In conducting a harm analysis, we think it prudent to take note of factors that federal courts commonly consider in assessing harm from a retroactive misjoinder. Specifically, among other possible considerations, we will assess: (1) whether the evidence was so inflammatory that it would tend to cause the jury to convict on the remaining counts; (2) the degree of overlap and similarity between the dismissed and remaining counts; (3) the strength of the prosecution's case on the remaining counts; (4) whether the trial court diligently instructed the jury; and (5) whether there is evidence, such as the jury's rendering of selective verdicts, to indicate that the jury compartmentalized the evidence. (*United States v. Lazarenko*, *supra*, 564 F.3d at 1044.)

### a. Inflammatory Nature of the Evidence

The jury learned Williams had been previously convicted of a felony in order to establish an element of count 3. It is widely recognized that informing a jury that a defendant has been previously convicted of a felony is highly inflammatory.[16] (E.g., *Burgett*, *supra*, 389 U.S. at p. 115; *Aldrich*, *supra*, 169 F.3d at p. 528;[17] *People v.*

---

[16] Despite the inflammatory nature of a prior conviction, we note that a defendant may be impeached with a prior felony (*United States v. Hursh* (9th Cir. 2000) 217 F.3d 761, 768; *People v. Anderson* (2018) 5 Cal.5th 372, 407), and an offer to stipulate will not prevent a jury from being informed that a defendant is an ex-felon when a prior felony conviction is an element of an offense (*People v. Cunningham* (2001) 25 Cal.4th 926, 984).

[17] *Aldrich* stated that admission of a prior conviction is " ' "always … prejudicial." ' " (*Aldrich*, *supra*, 169 F.3d at p. 528, quoting *United States v. James* (D.C. Cir. 1977) 555 F.2d 992, 1000.) To the extent that *Aldrich* suggests that the erroneous admission of a prior conviction is per se reversible, we cannot agree. Our Supreme Court has recognized that the erroneous admission of a prior conviction is subject to a harmless

*Thompson* (1980) 27 Cal.3d 303, 314.) This is because a defendant's felon status tends to draw the jury's attention away from the facts of the case and shift its attention to the fact that the defendant is a felon and thus, a person of bad character. (*Aldrich*, at p. 528; *People v. Gray* (2007) 158 Cal.App.4th 635, 641 (*Gray*).)

However, it is also well recognized that where a jury is simply informed that a defendant was previously convicted of a felony, without identifying the felony or describing the facts surrounding the felony, the inflammatory effect is often diminished. (E.g., *United States v. Mink* (8th Cir. 2021) 9 F.4th 590, 605; *Gray, supra*, 158 Cal.App.4th at p. 642.) Indeed, our Supreme Court has explained that when a prior conviction is a substantive element of an offense, the element may be satisfied if "the defendant stipulates to the [prior] conviction and the court 'sanitizes' the prior [conviction] by telling the jury that the defendant has a prior felony conviction, without specifying the nature of the felony committed." (*People v. Sapp* (2003) 31 Cal.4th 240, 262; see also CALCRIM No. 2591.) That is what happened in this case. The jury was not informed about any of the circumstances surrounding the conviction, including the offense. The jury was simply told that the parties agreed that Williams had been previously convicted of a felony.

Accordingly, we conclude that while the inflammatory effect of the prior felony conviction was significant, the inflammatory effect was nevertheless reduced based on the sanitizing language utilized by the stipulation. (Cf. *United States v. Mink, supra*, 9 F.4th at p. 605; *People v. Sapp, supra*, 31 Cal.4th at p. 262; *Gray, supra*, 158 Cal.App.4th at p. 642.)

---

error analysis. (*People v. Johnson, supra*, 12 Cal.5th at p. 611; *In re Terry, supra*, 4 Cal.3d at p. 916.)

### b. Degree of Overlap

Evidence concerning the prior felony was only relevant to count 3, felon in possession of ammunition. Count 3 was a stand-alone count that had no relation or relevance to the drug-related counts and the child endangerment counts. None of the evidence used to prove count 3 would be relevant or admissible to other counts, and vice versa. Furthermore, the only time that the prosecutor mentioned the felony prior was during her closing argument in connection with count 3. Therefore, there is no overlap between count 3 and the other counts.

### c. Trial Court's Instructions

The trial court initially informed the jury that the parties stipulated that defendant had been previously convicted of a felony. The court then correctly instructed the jury with CALCRIM No. 2591. The instruction informed the jury that Williams had stipulated that he was previously convicted of a felony, the jury was to accept this fact as true, but that the jury could not consider this fact for any other purpose beyond count 3 and could not speculate about the nature of the conviction. This was an appropriate instruction that focused and limited the jury's consideration of Williams's felon status to only count 3. We generally presume that a jury follows all applicable instructions, including limiting instructions. (*People v. Chhoun* (2021) 11 Cal.5th 1, 30; *People v. Frederickson* (2020) 8 Cal.5th 963, 1026; *Hall*, *supra*, 67 Cal.App.4th at p. 136.)

### d. Jury Compartmentalization

It appears that the jury appropriately compartmentalized evidence and the counts alleged against Williams. Count 1 (possession for sale of cocaine) was alleged as a felony. The jury acquitted Williams of the felony and instead found him guilty of a lesser included misdemeanor (possession of cocaine). The fact that the jury concluded that the People had not met their burden of establishing felony possession for sale of cocaine indicates the jury carefully considered the evidence presented and was not influenced by the prior felony stipulation beyond count 3.

### e.     Strength of the Evidence

#### i.     Count 6

Williams told law enforcement that he had no part in the cultivation of marijuana on the property.  However, Guerrero testified that Williams owned the property and essentially everything on it, including the greenhouses.  Williams also had muddy shoes, where the only source of mud on or near the property appears to have been the marijuana greenhouses.  Further, several pounds of processed marijuana were found in Williams's bedroom, and 700 pounds of marijuana were found in the U-Haul.  Although the U-Haul was registered to Scott, law enforcement determined that the U-Haul actually belonged to Williams, and Williams admitted that he had moved the contents found in the U-Haul from a smaller trailer into the U-Haul.  Further, 816 marijuana plants in various stages of growth were found in the greenhouses, and Williams spontaneously asked law enforcement after his car was stopped trying to flee the scene whether "this was about the marijuana."  Finally, Williams's daughter spoke about officers finding "their weed" in the U-Haul, which suggests both Scott and Williams participated in the marijuana grow.  This evidence strongly supports the jury's guilty finding on count 6.

#### ii.     Counts 4 and 5

The two child endangerment counts involved a one year old and a four year old. The evidence showed these children were being raised in or exposed to an active illegal marijuana grow.  As part of the marijuana grow, officers testified that there were toxic (if ingested) fertilizers and pesticides on the ground near the greenhouses, meaning that these products could be accessible to young children.[18]  There were several pounds of marijuana located throughout the main house where the children lived, including in Williams's bedroom.  Guerrero testified that there were solar capacitors with exposed

---

[18]     Children's play toys were found in front of the main house, which indicates that the children could have been able to wonder into the greenhouses.

31.

wiring also in Williams's bedroom. The array of capacitors went from the ground to the ceiling and were partially covered by a sofa. Guerrero testified without objection that this was a dangerous hazard, that children could have had access to the array, and that he himself got nowhere near the array. These aspects of living in the midst of or being exposed to an active illegal marijuana grow constitute substantial evidence that the children were criminally endangered.

### f.       Conclusion

The above considerations demonstrate that the jury was exposed to inflammatory evidence when they were informed that Williams had a prior felony conviction. However, the inflammatory nature of that evidence was reduced because the circumstances and nature of the prior felony were not disclosed and the jury was instructed to consider the evidence only for count 3 and to not speculate about the nature of the felony. There is no indication that the jurors failed to do this. To the contrary, the fact that the jury acquitted Williams of the count 1 felony strongly indicates that the jurors examined each count and the evidence supporting each count separately and without regard to the prior felony (except of course for count 3). Further, the fact that count 3 is factually and legally separate and distinct from the remaining counts may have made it easier for the jury to follow the instructions and only consider the prior felony for purposes of count 3. Finally, the evidence to support count 6 was strong and the evidence to support counts 4 and 5 was substantial. Given these considerations, we cannot conclude that there is a reasonable probability that Williams would have had a better result on counts 4, 5, and 6 if the jury had not been informed that he was a convicted felon.[19]

---

[19]     We recognize that *Burgett* found harm despite the fact that the trial court directed the jury not to consider the prior conviction for any purpose. (*Burgett*, *supra*, 389 U.S. at pp. 113, 115.) Nevertheless, *Burgett* did not establish a per se rule that requires reversal

32.

## IV. ERRORS REGARDING AGGRAVATING FACTORS

Williams argues the trial court violated *Lynch* by determining the three aggravating factors alleged in the amended information were true.[20] Williams also argues that insufficient evidence supports the finding that he had served a prior prison term.

We need not address the substance of Williams's arguments because the issue is now moot. The aggravating factors were alleged only with respect to the three felony counts, counts 1, 2, and 3. However, the jury acquitted Williams on the count 1 felony, and we have determined that insufficient evidence supports Williams's convictions on counts 2 and 3. Because the three aggravating factors relate only to felony counts to which Williams has essentially been acquitted, the three aggravating factors have no further application to Williams's case.

## V. STAY OF COUNTS 6 OR 7 PURSUANT TO SECTION 654

### A. Parties' Arguments[21]

Williams argues the trial court should have stayed the sentence on either count 6 or count 7 pursuant to section 654 because these offenses were committed with the same intent and objective of cultivating and selling marijuana. Williams argues that substantial evidence does not support the court's implicit finding that counts 6 and 7 were committed with separate intents.

---

whenever a jury is erroneously informed of a prior conviction. Under the particular facts and circumstances of this case, we conclude that Williams was not harmed.

[20] We note that at the time the trial court found the three aggravating factors to be true, *Lynch* had not yet been decided. In part, *Lynch* held that "[e]xcluding properly proven prior convictions or a defense stipulation, a jury finding is now required for all facts actually relied on to impose an upper term." (*Lynch*, *supra*, 16 Cal.5th at p. 757.)

[21] The parties briefing involved counts 2, 6, and 7. Because we have determined that count 2 is insufficiently supported, we limit our discussion of the section 654 issue to counts 6 and 7.

The People agree that substantial evidence does not support the trial court's implicit finding that Williams harbored separate intents with respect to counts 6 and 7. Instead, the People concur that Williams possessed and cultivated marijuana and marijuana plants as part of a single objective to grow and sell marijuana.

## B.    Legal Standard

Section 654 provides in part that an "act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision." (§ 654; *People v. Brents* (2012) 53 Cal.4th 599, 618.)  Section 654 may apply to an indivisible course of criminal conduct involving violations of different statutes, where the defendant commits the violations with a single intent and objective. (*People v. Rodriguez* (2009) 47 Cal.4th 501, 507; *People v. Vasquez* (2020) 44 Cal.App.5th 732, 736–737.)  It has been held that section 654 applies to prevent a defendant from being punished for both possession of marijuana and cultivation of marijuana where the possession was merely incidental to the cultivation. (*People v. McDaniel* (1957) 154 Cal.App.2d 475, 485–486.)  A court's implicit or express finding that a defendant harbored different intents and objectives for purposes of section 654 is reviewed for substantial evidence. (*Brents*, at p. 618; *People v. Richardson* (2025) 108 Cal.App.5th 1203, 1214.)

## C.    Analysis

The parties agree that substantial evidence does not support the trial court's implicit finding that Williams harbored different intents and objectives with respect to counts 6 and 7.  We also do not detect substantial evidence.  As discussed above, it is apparent that the property was used to grow, cultivate, and process marijuana for sale at another location.  Because the possession, cultivation, and processing of the marijuana plants, and the resulting possession of processed marijuana, were part of a single criminal objective to grow, process, and sell marijuana, the court erred by not staying either count 6 or count 7. (Cf. *People v. McDaniel*, *supra*, 154 Cal.App.2d at pp. 485–486.)

34.

## VI. FEE AND PENALTY ASSEMENT ON COUNT 7

### A. Parties' Arguments

Williams argues the trial court erred by imposing a fee and an assessment on the count 7 offense because convictions under section 11357, subdivision (b) are specifically exempted from the fees provisions of section 11372.7.

The People agree with Williams that the $100 fee imposed pursuant to section 11372.7 was unauthorized and must be reversed. However, the People argue that the $310 assessment is made up of several different assessments and Williams has not shown that any of the individual assessments cannot apply to a section 11357 offense. Therefore, the People argue that the $310 assessment should remain in place.

In reply, Williams argues that the $310 assessment is unauthorized because the individual components are all based on and calculated from the $100 fee imposed under section 11372.7. Because the amount of fee imposed under section 11372.7 should have been zero, Williams argues that the additional assessments must also be zero.

### B. Analysis

#### 1. $100 Fee

Section 11372.7 provides in part that "each person who is convicted of a violation of this chapter shall pay a drug program fee in an amount not to exceed [$150] for each separate offense." (§ 11372.7, subd. (a).) However, section 11372.7 expressly states that it "shall not apply to any person convicted of a violation of [section 11357, subdivision (b)]." (§ 11372.7, subd. (e).) Here, Williams's count 7 conviction was for a violation of section 11357, subdivision (b) (possession of more than 28.5 grams of marijuana). Therefore, as both parties correctly conclude, the trial court erred by imposing any fee with respect to count 7. (*Ibid.*)

### 2.    $310 Assessment

The $310 assessment imposed by the trial court consisted of the following six components:  $100 pursuant to Penal Code section 1464, subdivision (a); $70 pursuant to Government Code section 76000, subdivision (a); $10 pursuant to Government Code section 76104.6, subdivision (a); $40 pursuant to Government Code section 76104.7; $50 pursuant to Government Code section 70372, subdivision (a); $20 pursuant to Government Code section 76000.5; and $20 pursuant to Penal Code section 1465.7.  Each of these penalties are calculated based on the amount imposed under an independent criminal fine.  For example, Penal Code section 1464 requires a court to levy a penalty of $10 for every $10 or part of $10 imposed as a part of criminal fine (Pen. Code, § 1464, subd. (a)), Government Code section 76104.7 requires a court to levy a penalty of $4 for every $10 or part of $10 imposed as part of a criminal fine (Gov. Code, § 76104.7, subd. (a)), and Penal Code section 1465.7 requires a court to levy a fine that is 20 percent of the criminal fine used to calculate the penalty under Penal Code section 1464 (Pen. Code, § 1465.7, subd. (a)).  Thus, imposition of an independent criminal fine is a necessary prerequisite for the imposition of any of the seven components of the $310 assessment.

Here, as explained above, because section 11372.7 expressly excludes offenses under section 11357, subdivision (b), no fine under section 11372.7 could be imposed. Without the criminal fine under section 11372.7, none of the seven components of the $310 assessment could be imposed because no criminal fee was imposed.  Therefore, the court erred in imposing the $310 assessment.

## VII.    CLERICAL ERRORS IN THE JUDGMENT

A trial court's oral pronouncement of sentence constitutes the judgment in a criminal case, and to the extent there is a discrepancy between the oral pronouncement and a minute order or abstract of judgment, the oral pronouncement will control.  (*People v. Gobert* (2023) 89 Cal.App.5th 676, 689; *People v. Scott* (2012) 203 Cal.App.4th 1303,

1324.)  Reviewing courts on appeal may correct any discrepancy that exists between a trial court's oral pronouncement of sentence and a minute order or abstract of judgment. (*Gobert*, at p. 689; *Scott*, at p. 1324.)

Here, the parties have identified the following discrepancies between the trial court's oral pronouncement of sentence and the corresponding July 12, 2024 minute order:  (1) with respect to count 2 at page 3, the minute order lists the basis for fines and penalties as section 11372.5 instead of 11372.7; (2) with respect to count 2 at page 4, the minute order identifies the amount of penalty assessments as $3,210 instead of $310; (3) with respect to count 1 at page 5, the minute order lists the basis for fines and penalties as section 11372.5 instead of 11372.7; (4) with respect to count 5 at pages 5 and 6, all fees and penalties are improper because they were not imposed as part of the oral pronouncement of sentence.[22]  We agree with the parties that these discrepancies exist, and will order the court to correct them on remand.  (*People v. Gobert*, *supra*, 89 Cal.App.4th at p. 689.)

## DISPOSITION

The convictions on count 2 (§ 11366) and count 3 (Pen. Code, § 30305) are reversed.  The $100 fee under section 11372.7 and the $310 assessment imposed with respect to count 7 (§ 11357) are reversed.  Williams's sentence is vacated.  On remand, the court is directed to:  (1) conduct a full resentencing of Williams, (2) stay either count 6 or count 7, and (3) correct the July 12, 2024 minute order as follows:  (a) with respect to count 1, identify the basis for fees and assessments as section 11372.7 instead of 11372.5; (b) with respect to count 2, identify the amount of the assessment as $310 instead of $3,210 and identify the basis for fees and assessments as section 11372.7

---

[22]    The parties agree that count 7 should also be corrected.  However, the minute order accurately reflects the fines and assessment that were imposed on count 7 during oral pronouncement.  Therefore, there is no discrepancy to correct between the oral pronouncement and the minute order.

37.

instead of 11372.5; and (c) with respect to count 5, delete all fees, penalties, and assessments. The judgment is otherwise affirmed.

                                                                      HARRELL, J.

WE CONCUR:


DETJEN, Acting P. J.


PEÑA, J.